06-1027

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

GORDON ROBERTSON,

    Plaintiff-Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF LAS ANIMAS COUNTY
LAS ANIMAS COUNTY SHERIFF'S DEPARTMENT,
LAS ANIMAS COUNTY SHERIFF JAMES CASIAS,
KURT EMERY, and CADE BASSETT,

    Defendants-Appellees.

On Appeal from the United States District Court
for the District of Colorado

The Honorable Edward Nottingham, District Judge

District Court Civil Action No. 04-CV-2294

APPELLANT'S REPLY BRIEF

VIRGINIA H. LOUDEN
Attorney for Appellant
267 North Commercial Street
Trinidad, CO 81082
(719) 845-4060

MARC CHARMATZ
Senior Attorney
National Association of the Deaf
Counsel for Appellant on ADA Issues
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7732

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ……………………………………………….    iii

REPLY CONCERNING STATEMENT OF FACTS ………………………..    1

FALSE ARREST AND IMPRISONMENT ARGUMENT …………………    26

    I.  The District Court erred in granting summary judgment
for the Appellees regarding the false arrest and false
imprisonment claim……………………………………………….

        A.  A genuine issue of material fact exists as to whether the
Defendants  involved had a good faith basis and thus,
reasonable probable cause to arrest, or whether they had no
good faith basis for the arrest as they lost all good faith by
intentionally prevaricating in the Affidavit for Warrantless
Arrest on November 4, 2003, by altering exculpatory evidence,
and by other criminal behavior.

    II.    Whether the District Court erred in granting summary judgment
for Appellees on the issue of lack of training of Deputies
Bassett and Emery which training was so deficient as to be
reckless.

ADA ARGUMENT ……………………………………...………………..    43

    I.    The District Court erred in granting summary judgment for the
Appellees regarding Mr. Robertson's Title II ADA Claims

        a.  A genuine issue of material fact exists as to whether Mr.
Robertson is disabled.

        b.  A genuine issue of material fact exists as to whether Mr.
Robertson was denied participation in, and the benefit of,
services of the Las Animas County Jail by reason of his
disability.

CONCLUSION …………………………………………………...……. 69

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)..…………….. 71

CERTIFICATE OF SERVICE ………………………………………… 72

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                              **PAGE**

*Anderson v. Creighton,*
    **483 U.S. 635, l07 S. Ct. 3034 (1987)……………………………**  **13**

*Beck vs. University of Wisconsin Bd. of Regents,*
    **75 F.3d 1130 (7th Cir. 1996)…………………………………......23**

*Bisbee v. Bey,*
    **39 F.3d 1096 (10th Cir. 1994)………………………………7, 29**

*Bosket v. Long Island Railroad,*
    **2004 U.S. Dist. LEXIS 10851, *13 (E.D.N.Y. 2004)……………**  **18**

*Bragdon v. Abbott,*
    **524 U.S. 624 (1998)……………………………………...……**  **17**

*Chisolm v. McManimon,*
    **275 F.3d 315 (3rd Cir. 2001) …………………………………**  **28**

*Conley v. Bidermann Indus.U.S.A*
    **1998 U.S. Dist. LEXIS 8550, *15 (S.D.N.Y. 1998)…………........**  **18**

*Daniels v. Williams,*
    **474 U.S. 327, 106 S. Ct. 662 (1985)…………………………… 14**

*Finical v. Collections Unlimited, Inc.*
    **65 F. Supp. 2d 1032 (Ariz, 1999)………………………………… 19**

**Hedberg v. Indiana Bell Telephone Co.,**
    **47 F.3d 928 (7th Cir. 1995) ………………………………………**  **23**

*Hunter v. Bryant,*
    **502 U.S. 224, 112 S. Ct. 534 (191)…………………………….. 12**

*Ivy v. Jones,* **192 F.3d 514 (5th Cir. 1999)…………,…………………**  **21**

*Kent v. Martin,*
      252 F.3d 1141 (10th Cir. Okla 2001)……………………………… 14

*Jones v. City and County of Denver,*
      854 F.2d 1206 (10th Cir. 1988)………………………………… 12

*Kennington v. Marion County Sheriff*
      2004 U.S. Dist. LEXIS 19572, *15 (D. Ind. 2004) …………….. 28

*Patrice v. Murphy,*
      43 F. Supp. 2d 1156 (D. Wash. 1999)…………………………… 29

*Romero v. Fay,*
      45 F.3d 1472 (10th Cir. 1995)…………………………...… 12, 13, 14

*Sutton v. United Air Lines, Inc.,*
      527 U.S. 471 (1999) ………………………………………. …. 20

*Templeton v. Neodata Services,*
      162 F.3d 617 (10th Cir. 1998)………………………………… 23

*Wilson v. Aetna Life and Casualty Co.*
      195 F. Supp. 2d 419 (W.D.N.Y. 2000)…………………………… 19

## STATUTES

**42 U.S.C. §12102 (2)**………………………………………………………**17**

**42 U.S.C. §12112(5)(B)**……………………………………………… **22**

**42 U.S.C. §12132** ……………………………………………… **21**

**42 U.S.C. §12201 (a)**……………………………………………… **17**

## OTHER

**28 C.F.R. §35.104(1)**……………………………………………… **22**

**28 C.F.R. §35.104(1)(ii)(2)**……………………………………………. **17**

**28 C.F.R. §35.106**…………………………………………………….. **26**

**28 C.F.R. §35.160** …………………………………………….. …. **26**

**28 C.F.R. §35.160 (a)** …………………………………….. ……. **28**

**28 C.F.R. Pt. 35, App. A**…………………………………………. **28**

**28 C.F.R. Pt. 36, App. B**……………………………………………. **17**

**28 C.F.R. §35.160(b)(1)** …………………………………….. …… **21**

**45 Fed. Reg. 35,694,35,702  (July 26, 1991)** …………………………. **26**

**Americans with Disabilities Act ("ADA")**…………………….. **16, 19, 20**

**Americans with Disabilities Act, Title I**……………………………….. **22**

**Americans with Disabilities Act, Title II** ……………….. **17, 21, 26, 28**

**Rehabilitation Act of 1973, Section 504** ……………………………… **17**

## INTRODUCTION

In their Response Brief, the Appellees continue their tactic, which they pursued below, of making false allegations of the true facts.   The Appellees apparently do so because the true facts necessitate a reversal of the District Court's orders.   The Appellees' Response ignores the importance of the falsification of evidence by Defendants Bassett and Emery, which falsification destroyed any possibility of immunity and caused the 4th Amendment violation of false arrest and imprisonment.   There are material issues of fact on all issues which require a trier of fact to determine and which require a reversal of the granting of the Motion for Summary Judgment.

## REPLY CONCERNING STATEMENT OF FACTS

In their Response Brief ("Response"), the Appellees do not seriously challenge any of the material fact issues upon which Mr. Robertson's appeal is based—that of falsification of exculpatory evidence and inclusion of that false evidence in a "sworn" Affidavit for Warrantless Arrest, and that once having knowingly added false evidence, all statements and actions of said Defendants are tainted and lack credibility.  Instead, the Appellees chose to misstate the actual facts and to refuse to admit that, even by their misstating the facts, they

prove that there are genuine, material issues of fact that must be decided by a
trier of fact.

**Appellees don't refute** that Defendant Bassett's accurate notes in his
daily log of September 25, 2003 (Aplt. App. 252)  are directly opposite to
Defendants Bassett's and Emery's sworn Affidavit created on November 4,
2003 (Aplt. App. 285-286) and opposite to Bassett's deposition testimony
(Aplt. App. 158-159).  The Appellees falsely state that the issue wasn't raised in
the lower court.  (Response at 19).

**In fact,** the issue of falsification of exculpatory evidence was raised in
the lower court.  *See* Mr. Robertson's Response to Motion for Summary
Judgment at Aplt. App. 81.

**Appellees allege that** Mr. Robertson is attempting to add more claims
than originally pled in his complaint.  (Response at 16, 17, 18, 19).

**In fact the truth** is that Mr. Robertson filed his complaint on the first
false arrest prior to the third false arrest being dismissed by the state court.  Mr.
Robertson is not seeking to add further claims to his complaint, but is bringing
to the attention of this court the continuous misbehavior of the Defendants that
adds credence to the fact that the first arrest and imprisonment were unlawful.
Angry that the state court dismissed the first arrest as lacking in probable cause,
and in an attempt to protect the secrecy of their altering exculpatory evidence

and making false statements in the first warrantless arrest affidavit, the

Defendants Emery and Bassett relentlessly pursued this deaf man, attempting to

ruin and destroy his otherwise peaceful life through two more arrests and a

search warrant which produced nothing. Thus the second and third arrests are

relevant to the proof of the misbehavior of the deputies in the first arrest and

show a pattern of improper arrests and investigations.

**Appellees allege that:** "[o]n October 2, 2003, Murnane called 911 to

report she had observed Plaintiff on her property, standing between two trailers

in her yard. [Aplt. App. 161]." (Response at 5).

**In fact:** There was no direct, admissible evidence that Murnane

identified Plaintiff on her property that day, or that Murnane actually stated

those words on the 911 call.    The Appellees refer to a statement in Defendant

Cade Bassett's deposition that he understood that Murnane telephoned 911 and

stated that she saw Robertson, but Defendant Bassett never heard those words.

Appellees produced no direct evidence that those were the actual words of

Murnane.  The Appellees could have produced a copy of the recording of the

911 call, but failed to do so.   Appellant contends that whether or not Murnane

actually said these words or whether or not Murnane, Bassett and Emery were

setting Mr. Robertson up for a false arrest is a material fact at issue in this case

that must be decided by a trier of fact.

**Appellees allege:**  "Murnane reported to Defendant Emery that her daughter Samantha had observed Plaintiff on her property looking into the daughter's bedroom window. (Aplees. App. at 089-090; 057-058)."  (Response at 5)

**In fact:**  The record shows that Samantha testified under oath that she never saw Plaintiff looking into her bedroom window at any time, let alone November 4.  On November 4, 2003, Samantha was in the family car and not in her bedroom.  (*See* Aplt App. at 235).   The fact that Defendants Bassett and Emery made this false statement in a sworn Affidavit is solid evidence that Murnane, Bassett and Emery were conspiring to smear, harass and prepare false evidence against Mr. Robertson, and that Emery was grasping at straws to form an Affidavit for the Warrantless Arrest.   At the very minimum, the contradiction in Samantha's sworn testimony in county court and the Emery Affidavit sets up the genuine, material fact at issue that must be decided by a trier of fact.

**Appellees allege** in their Summary of Argument that Defendant Emery reasonably relied on the statements of Terri Murnane and her daughter, Samantha (Response at 11) and that he determined that they were credible (Response at 5).

**In fact,** Defendant Emery and Defendant Bassett had spent numerous nights in surveillance of Mr. Robertson's nine acres and had never seen Mr. Robertson cross over onto the Murnane property.   (Aplt.'s App at 158).   Thus the Defendants had no evidence that the Murnanes were credible.   They had the opposite evidence.   Since they had conducted surveillance on numerous occasions in September and October, 2003, and had never once seen Mr. Robertson enter upon the Murnane property, the Defendants had only evidence that the Murnanes were <u>not</u> credible.   Whether a reasonable, well-trained deputy would rely on the alleged Murnanes' statements, even if they had been made, is a genuine, material issue which a trier of fact must determine.

Defendants Emery and Bassett were not well-trained, reasonable deputies. They were criminal trespassers, criminally altered exculpatory evidence and did everything in their power to convince the lower court that their altered evidence was true.

**Appellees allege** that Mr. Robertson lifted the barbed wire fence up so he could pass under it.  (Response at 5).

**In fact:**  The Appellees produced no eye witness or direct sworn statement that Mr. Robertson lifted the fence so that he could pass under it and their conclusion that Mr. Robertson lifted the fence was pure speculation.  No adult would lift a barbed wire fence to pass under it; adults are too tall to do

that; adults pass through the top and second rung of barbed wire; only children lift the bottom rung of barbed wired fences to pass under them.  The Defendants cannot base an arrest warrant on pure speculation.

**Appellees allege** that the Bassett Affidavit was prepared "couple of months" before the November 4, 2003 Affidavit for Warrantless Arrest and therefore falsely conclude that Defendant Bassett is not responsible for the false Affidavit.  (See Response at 6).

**In fact,** the truth is that Bassett's portion of the Affidavit (Aplt. App. at 285-286) talks about events starting on September 19, through September 25, 2003 and October 3, 2003, thus Defendant Bassett's portion of the Affidavit was not completed "months" before, but in October, 2003.  The falsity of the Appellees allegations continue unabated.

**Appellees allege** that Mr. Robertson's brief alleges that Defendant Emery did not receive training while employed in Las Animas County, and in their Response brief at 21, assert that Las Animas County sent Defendant Emery for post-certification training.

**In fact,** the truth is that Defendant Emery testified in his deposition (See Aplt. App. at 168) that Arapahoe County Sheriff's Department sent him for post-certification training.   Thus Mr. Robertson is correct.  Las Animas County never gave Defendant Emery any substantive training.

**Appellees allege** that Mr. Robertson did not assert failure of training as a claim against Sheriff Casias in the lower court.  (Response at 21-22).

**In fact,** the truth is that Mr. Robertson did assert gross negligence in providing training to his deputies in Mr. Robertson's Response to the Motion for Summary Judgment in the lower court.  (See Aplt. App. at 103).

In short, virtually all of the principal factual premises upon which the Appellees' Response is based are false and are therefore contested.  These contested issues highlight that the U.S. District Court Judge's granting of the Appellees' Motion for Summary Judgment was not based upon the applicable law.  The law for a Motion for Summary Judgment is that all genuine, material issues of fact must be decided in favor of the Plaintiff in determination of the Motion, and, if such exists, the Motion for Summary Judgment must be denied so that the material contested issues may be determined by a trier of fact. *Bisbee v. Bey*, 39 F. 3d 1096, 1100 (10th Cir. 1994).

## ARGUMENT RE:    FALSE ARREST AND IMPRISONMENT

### III.    The District Court erred in granting summary judgment for the Appellees regarding the false arrest and false imprisonment claim.

**A.  A genuine issue of material fact exists as to whether the**

**Defendants involved had a good faith basis and thus, reasonable**

**probable cause to arrest, or whether they had  lost all good faith    st**

**by intentionally prevaricating in the Affidavit for Warrantless Arrest**

**on November 4, 2003, by altering  exculpatory evidence, and by their**

**other criminal behavior.**

In support of Plaintiff's contention that the Defendants were dishonest, Plaintiff has shown that the Defendants altered exculpatory evidence, lied about the statements of the two alleged witnesses, trespassed without a warrant onto Appellant's property during surveillance of  Appellant's property, and when the local district judge threw out the November 4, 2003 arrest as lacking in probable cause, commenced a deliberate smear and arrest campaign against Appellant, creating more evidence that the officers had deliberately prevaricated in the first arrest, losing all qualified immunity**.**

**Appellees contend** that Mr. Robertson failed to demonstrate a violation of the Fourth Amendment in his claim for False Arrest on November 4, 2003, and contend that the burden is on Mr. Robertson to show that the "statements supplied to Emery by Terri Murnane and her daughter, Samantha Murnane, on November 4, 2003, 'did not constitute reasonably trustworthy

information sufficient to lead a prudent police officer to conclude' that he had probable cause to arrest Plaintiff."

**In fact,** Mr. Robertson has met any burden he might have with regard to that issue, to wit:

(1) Mr. Robertson contends that 13-year-old Samantha Murnane <u>never</u> made that statement to Emery, and as evidence has shown her contradictory, sworn testimony in court on November 13, 2003.   It follows logically that if the daughter, Samantha, did not make that statement, then her mother, Terri Murnane, more likely than not, did not make a similar statement.   Therefore, the logical conclusion is that Emery falsely created those statements.

(2) Assuming arguendo that the Murnane mother and daughter made those statements, no reasonably prudent officer knowing the facts and circumstances that Defendant Emery knew, would conclude that Mr. Robertson had committed the crime, to wit:

A.  Defendant Emery knew that his many days and nights of surveillance could not substantiate any of the claims that Murnanes made.

B. Defendant Emery knew that Defendant Bassett, (Emery's

subordinate, Aplt. App. at 187), had changed the evidence shown

in Bassett's daily log, falsifying exculpatory evidence:

Defendant Bassett wrote in his daily log for September 25, 2003:

"20:30 to 23:10"   "Savelance (sic) at CR 89.7/suspect
was observed standing outside of his residenck (sic)
however he did not approach the victims residence."

(Aplt. App. at 252).

This daily log entry was the truth.  This was an entry into a

daily log completed by Defendant Bassett on a day, September

25, 2003, when he had not yet made a decision to start

falsifying evidence.  He was not yet desperate to arrest Mr.

Robertson.

C.  Defendant Emery knew, or as Bassett's supervisor, had to

know, that Defendant Bassett intentionally altered that exculpatory

evidence for the November 4, 2003 "Affidavit for Arrest Warrant,"

and in his deposition.  In the Affidavit, he changed that evidence to:

"On September 25, 2003 at approximately 2030 hours
Defendant Elliot Grubert dropped your Affiant off at the
intersection of CR 89.7 and Hwy. 160.  Your Affiant
approached Mrs. Murnanes (sic) residence on foot and
watched the residence from a neighboring field.  At
approximately 2200 hours your Affiant observed the suspect
(Gordon Robertson) exit his residence and begin to walk
across his property toward Mrs. Murnane's residence.

16

> "As Mr. Robertson approached Mrs. Murnane's fence, your Affiant observed a vehicle traveling on CR 89.7 in the direction of Mrs. Murnane's residence. Your Affiant observed the suspect turn and begin walking back to his residence. The vehicle appeared to deter the suspect. Your Affiant observed the suspect walking around his residence shining a flashlight, then enter his residence. The suspect did not cross onto the Murnane's property."

Aplt. App. at 320.

This change from a daily log entry that states that Mr. Robertson never approached the Murnane residence but only stood at his door, to falsely stating that Mr. Robertson exited his residence and began to walk across his property toward Mrs. Murnane's residence, only to be deterred by an alleged car approaching from the rear which Mr. Robertson could neither hear (he is deaf) nor see (as the road would have been behind the house if he was nearing the fence), is an extreme prevarication and criminal act. This is a criminal altering of exculpatory evidence by two deputies who were determined to make this innocent, deaf man into a monster.

Defendant Emery was Defendant Bassett's supervisor. As the supervisor of Defendant Bassett, Defendant Emery had a legal obligation to Mr. Robertson and to the citizens of Las Animas County to be certain that Defendant Bassett did not prevaricate. Defendant Emery owed his own duty to Mr. Robertson not to use Defendant Bassett's prevarication in his own sworn Affidavit. Having

failed in both of those duties, Defendant Emery lost all qualified immunity and is liable to Mr. Robertson for false arrest and imprisonment.

See *Romero v. Fay*, 45 F.3d 1472 (1995), where the court quotes *Jones vs. City and County of Denver*, 854 F.2d 1206, at 1208-10 (10th Cir., 1988) stating that probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.

Thus, the opposite is also true—where a Defendant knows that the information in the Affidavit is untrue, is a prevarication, and thus cannot even approach "reasonably trustworthy," then no probable cause can exist for the arrest and qualified immunity is destroyed.  Where, as here,  the arresting Defendant knows that he has NO reasonably trustworthy evidence, where he knows that his many nights of surveillance produced no corroborating evidence of Murnane's accusations, and where he knows that his underling, Defendant Bassett, altered exculpatory evidence from his daily log into a false sworn affidavit that Mr. Robertson had commenced walking toward the Murnane residence, all in order to justify a Warrantless Arrest, then no probable cause exists for the arrest and qualified immunity is destroyed.

The *Romero v. Fay,* 45 F.3d 1472 (1995) court at 1477 goes on to quote the *Hunter v. Bryant* case, 502 U.S. 224, 112 S. Ct. 534, 536, (1991) which in turn quotes the *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) case at 641:

"Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."

Thus, again the opposite is true—where there is no "mistake," where there is no reasonableness, where the arresting officer is aware that the Affidavit of his underling deputy contains deliberately falsified evidence, the officer is <u>not</u> protected by qualified immunity. The deputy did it on purpose, and therefore immunity cannot exist for the deputy who created the false Affidavit or the deputy who knowingly used the false Affidavit. An arresting officer is not a "reasonably, prudent officer" if he is the one who has falsified evidence and/or who has condoned and included in his sworn affidavit, evidence he knows to be false. Defendants Emery and Bassett's acts were clearly prohibited. They destroyed their qualified immunity to suit.

Nor can the Defendants assert they were merely "negligent" in altering the words of the daily log of September 25, 2003. Changing the entire version from innocence to guilt is not "negligent." Thus, the Defendants cannot

assert a defense as set forth in *Daniels v. Williams*, 474 U.S. 327, 333 as set forth in *Romero v. Fay* case at 1479.

**Appellees allege** that this falsification by Bassett and Emery was not part of the record below.  (Response at 19-21, 23).

**In fact,** this evidence was part of the lower court record.  See Response to Motion for Summary Judgment ("MSJ") at Aplt. App. 81.  The lower court record included full transcripts of the depositions used in the Motions.  It was all available to the lower court and referred to in Mr. Robertson's Response. to the MSJ at Aplt. App. 81.

**Appellees allege** Appellant can <u>only</u> bring to the 10th Circuit the same arguments as made in the lower court.

**In fact**, that is not the law.  Upon review of the granting of a Motion for Summary Judgment, the 10th Circuit does a "de novo" review of the case. *Kent v. Martin*, 252 F.3d 1141, 1143, C.A.10 (Okla.) 2001.


IV.    <u>The District Court erred in granting summary judgment for Appellees on the issue of lack of training of Defendants Bassett and Emery which training was so deficient as to be reckless, when there were genuine issues of material fact to be determined by a fact finding jury.</u>

Defendant James Casias, in his capacity as Sheriff of Las Animas County, ("Casias") remains a Defendant.  His liability to Mr. Robertson is based upon Mr. Robertson's allegation that Casias' failure to train Defendants Bassett and Emery was so deficient as to be reckless.

Sheriff Casias, under oath, stated that he trained these Defendants in only physical contact and first aid.  Defendants Bassett and Emery never received training from Casias in "investigatory techniques, surveillance techniques," or any other matter other than physical contact and first aid.  (See Aplt. App at 102-3.)

There exists a genuine issue of material fact of whether or not Casias' minimal training approach was so deficient as to be reckless, causing Mr. Robertson's false arrest and imprisonment.

**Appellees allege** that the lack of training was a new claim only brought in this 10th Circuit court of de novo review.  (Response at 21)

**In fact,** the claim was made in Mr. Robertson's Response to the Motion for Summary Judgment.   (See Aplt. App. at 103).  The Appellees cannot defend this criminal behavior of the deputies involved.


**CONCLUSION RE FALSE ARREST AND IMPRISONMENT**

When officers are dishonest, incompetent, prevaricate, trespass and violate the law themselves in order to obtain warrants and fabricate evidence, as well as intentionally alter exculpatory evidence into purported evidence of guilt, all good faith disappears, no probable cause can exist and the Defendants lose qualified immunity.

Genuine material issues of the Defendants' dishonesty, credibility, and incompetence exist.  These issues must be determined by the fact finder—a jury.   A reasonable jury could readily find that Defendant Bassett and his supervisor, Defendant Emory, were incompetent, falsified evidence and were improperly caught up emotionally in the case.  A reasonable jury could readily find that the Defendants Emery and Bassett's  affidavits for arrests, with or without warrants, were so tainted that the Defendants lost qualified immunity and had no good faith, probable cause to arrest.   This Court must reverse and remand for trial.


**ARGUMENT RE: AMERICAN DISABILITIES ACT**


I.    **The District Court erred in granting summary judgment for the Appellees regarding Mr. Robertson's Title II ADA claim.**

    a.  **A genuine issue of material fact exists as to whether Mr. Robertson is disabled.**

To qualify as an individual with a disability under the Americans with Disabilities Act, an individual's physical or mental impairment must substantially limit one or more of that individual's major life activities. 42 U.S.C. § 12102(2). In regulations issued by the United States Department of Justice to implement Title II of the ADA, the DOJ recognizes "hearing impairments" as a "physical or mental impairment" and "hearing" as a major life activity. 28 C.F.R. §§ 35.104(1)(ii), (2).[1] The DOJ further states that "(a) person is considered an individual with a disability for purposes of . . . the first prong of the definition, when the individual's important life activities are restricted <u>as to the conditions, manner, or duration under which they can be performed in comparison to most people</u>." 28 C.F.R., pt. 36, App. B (emphasis added).

Mr. Robertson, who is now 63 years old, states in his affidavit: "I am profoundly deaf. I became totally deaf at age 45. I commenced becoming deaf in 1964 while I was in the Air Force. The Air Force determined that I was losing my hearing in 1965, at age 21." (Aplt. App. at 303). Although Mr. Robertson had a cochlear implant in 1990, he can "only watch television programs that have 'closed captioning' for the hearing impaired." *Id*. Furthermore, he cannot "hear over the telephone or any mechanical device." *Id*.

---

[1] This court may consider Section 504 and the Department of Justice regulations implementing Section 504, as they apply the same standard as Title II of the ADA. *See* 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998).

Mr. Robertson cannot hear or understand anyone whose back is turned to him. (Aplt. App. at 302).  Under the DOJ's regulations, Mr. Robertson's capacities must be compared to "the conditions, manner, or duration under which" most people can hear.  Because "most people" do not require special technology to watch television or use the telephone, and are able to hear people whose backs are turned, Mr. Robertson's hearing impairment qualifies him for protection under the ADA.  At the very least, there are factual issues which preclude summary judgment for the Appellees on this issue.  *See Bosket v. Long Island Railroad*, 2004 U.S. Dist. LEXIS 10851, *13 ( E.D.N.Y. 2004) (holding that "determining whether a hearing impairment is substantial necessitates a comparison between the plaintiff and a non-impaired individual.  Fact-intensive inquiries such as this often require resolution at trial."); *Connolly v. Bidermann Indus. U.S.A.*, 1998 U.S. Dist. LEXIS 8550, *15 (S.D.N.Y. 1998) ("Whether a plaintiff's hearing disability 'substantially limits' one or more of plaintiff's major life activities is an issue of fact to be decided at trial.").

The Appellees erroneously broaden the scope of the disability determination by arguing that "(p)laintiff's deafness does not substantially limit his major life activities."  (Aplees. Brief. at 26) (emphasis added).  This statement is not an accurate reflection of the question at issue, which is whether Mr. Robertson's hearing impairment substantially limits him in the major life

24

activity of hearing. *See Finical v. Collections Unlimited, Inc.*, 65 F.Supp.2d 1032, 1038-39 (D. Ariz. 1999) (rejecting the defendant's argument that the hearing-impaired plaintiff's ability to perform everyday activities was evidence that she was not disabled, and finding that "the only activity that should be considered is the very major life activity alleged to be substantially limited"); *Wilson v. Aetna Life & Cas. Co.*, 195 F.Supp.2d 419 (W.D.N.Y. 2000) (finding that the discussion of ADA coverage on the question of disability should focus only on the major life activity that the plaintiff alleges is affected by his or her impairment). The court in *Finical* illustrates this point with the example of an individual who has lost a limb, stating that although such a person may be able to engage in assorted activities to the same degree as individuals without similar impairments:

> this highly-functional individual's impairment, loss of a limb, generally will continue to substantially limit the major life activity of walking or running and thus the individual, albeit highly functional, will remain a disabled individual entitled to the protections that ADA accords.

65 F.Supp.2d at 1039. Mr. Robertson's belief that he does not suffer from any physical or mental problems is therefore irrelevant to the central question of whether he is substantially limited in the major life activity of hearing. He acknowledged in his deposition that he is "profoundly deaf," and there is nothing in the record to indicate that he did not believe he was substantially

limited in the major life activity of hearing;[2] therefore, the Appellees' argument

with respect to Mr. Robertson's degree of limitation fails.

Although the Appellees are correct in their assertion that the effect of Mr.

Robertson's cochlear implant must be considered when determining the extent

of his hearing limitation, they err in their analysis of the impact of the implant

and incorrectly interpret the United States Supreme Court's decision in *Sutton*

*v. United Air Lines*, 527 U.S. 471 (1999). The Court found that "(t)hose whose

impairments are <u>largely</u> corrected by medication or other devices are not

'disabled' within the meaning of the ADA," *Sutton*, 527 U.S. at 486 (emphasis

added); however, it clarified this position several sentences later, stating that

"(t)he use of a corrective device does not, by itself, relieve one's disability.

Rather, one has a disability under subsection (A) if, notwithstanding the use of a

corrective device, that individual is substantially limited in a major life

activity." *Id.* As applied to the facts at issue in that case, the Court found that

corrective lenses restored the plaintiffs' vision to 20/20, thereby eliminating any

limitation in the major life activity of seeing. *Id* .at 488-89. This effect is

distinguishable from that imparted by Mr. Robertson's cochlear implant, which

does not correct his hearing loss to the same degree that glasses restored the

petitioners' vision in *Sutton*. Mr. Robertson remains unable to use telephones

---

[2] As Mr. Robertson explains "I do not consider my deafness a 'health problem.' I do not get dizzy from it; I don't feel like I'm ever sick because of my hearing problem. To me, deafness is a communication problem and a disability, but it is not a health problem. I am not 'sick' from it." Aplt. App., at 304.

or televisions without technological assistance.  Similarly, the Appellees err in

relying on *Ivy v. Jones*, 192 F.3d 514 (5th Cir. 1999), where the plaintiff's

hearing aids restored her hearing to 96%.  Mr. Robertson's cochlear implant did

not result in a substantial mitigation of his hearing loss; therefore, the

Appellees' reliance on *Sutton* and *Ivy* is misplaced, and the District Court erred

in concluding as a matter of law that Mr. Robertson was not disabled.

> b.  A genuine issue of material fact exists as to whether Mr. Robertson
>     was denied participation in, and the benefit of, services of the Las
>     Animas County Jail by reason of his disability

Title II of the ADA states that "no qualified individual shall, by reason of

such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity . . . ."  42 U.S.C. § 12132.

The DOJ regulations, designed to ensure enforcement of this mandate, provide

that a public entity "shall furnish appropriate auxiliary aids and services where

necessary to afford an individual with a disability an equal opportunity to

participate in, and enjoy the benefits of, a service, program or activity

conducted by a public entity."  28 C.F.R. § 35.160(b)(1).  Examples of auxiliary

aids for persons with hearing impairments include "assistive listening systems,

telephones compatible with hearing aids, closed caption decoders, open and

closed captioning, telecommunications devices for deaf persons (TTY's),

videotext displays, or other effective methods of making aurally delivered

materials available to individuals with hearing impairments." 28 C.F.R. §

35.104(1). Here, the Appellees did not have a TTY to enable Mr. Robertson to

communicate by telephone with his attorney. The Appellees also lacked closed

captioned televisions, or "other effective methods of making aurally delivered

materials available to individuals with hearing impairments" at the televised

advisory hearing. Therefore, Mr. Robertson has pled sufficient facts to

demonstrate that the Appellees discriminated against him on the basis of his

disability.

     The Appellees incorrectly rely on cases arising under Title I of the ADA

for their argument that Mr. Robertson failed to put the Detention Center

officials on notice of his need for accommodation. In the cases cited by the

Appellees, the courts found that employers are required to accommodate those

disabilities of which they are aware; therefore, the fundamental question in

determining the employer's duty to accommodate is the extent of its knowledge

of an individual's limitations. *See* 42 U.S.C. § 12112(5)(B) ("not making

reasonable accommodations to the <u>known</u> physical or mental limitations of an

otherwise qualified individual with a disability . . .") (emphasis added).

Although it is sometimes necessary for an individual to enunciate his or her

disability-related limitations, the cases cited by the Appellees address

circumstances under which knowledge of an employee's restrictions could not

be imputed to the employer.  *See, e.g., Templeton v. Neodata Servs.*, 162 F.3d 617 (10th Cir. 1998) (finding that the appellant was required to provide further information to her employer about her ability to perform her job responsibilities after sustaining injuries in a car accident); *Beck v. Univ. of Wisconsin Bd. Of Regents*, 75 F.3d 1130 (7th Cir. 1996) (rejecting the appellant's failure to accommodate claim where the employee refused to provide detailed information about the impact of her depression on her ability to perform her job); *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928 (7th Cir. 1995) (holding that the appellant failed to demonstrate that his employer had knowledge of his disability, where his illness had no apparent symptoms).

Hearing loss as substantial as Mr. Robertson's, however, is more noticeable than other non-apparent physical or mental impairments, and therefore the reasoning applied in the aforementioned cases is inapplicable. This distinction was pointed out by the court in *Hedberg*, which noted that "(i)t may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability." 47 F.3d at 934.  Here, not only is there a question of fact as to whether the Detention Center officials were specifically told or knew of Mr. Robertson's hearing impairment, but also of whether Mr. Robertson's limitations would have been apparent to these officials.  Because the extent of

this knowledge is unclear, the District Court erred in granting summary judgment to the Appellees.

The Appellees' central argument is that the Detention Center officials were not aware of Mr. Robertson's need for such accommodation, and therefore were not obligated to provide any assistance. However, Mr. Robertson vigorously disputes this assertion, and has presented sufficient evidence regarding the extent of the Detention Center officials' knowledge of his disability and need for auxiliary aids and services to withstand summary judgment.

First, at the time of his arrest, Mr. Robertson asked the arresting officer (Sgt. Emery) if he could make a telephone call to his attorney. (Aplees. App. at 064). Mr. Robertson and his niece then made the call by using a relay service installed on his home computer.[3] When asked whether he told the Detention Center officer on duty on the night of Mr. Robertson's arrest that Mr. Robertson was deaf or hearing impaired, Sergeant Emery testified, "It seems to me that I told someone that he's – has difficulty hearing." (Aplt. App. at 189).[4] Furthermore, the booking officers inventoried the batteries to Mr. Robertson's cochlear implant. (Aplees. App. at 133).

---

[3] Mr. Robertson's niece is also deaf. Aplt. App., at 213.
[4] Furthermore, Mr. Robertson stated "I do not recall being asked if I was deaf. The detention officers simply acted as if they knew I was deaf. As well, Defendant Emery treated me as if I were deaf during the arrest of November 4, 2003." Aplt. App., at 303.

Second, Mr. Robertson did request an accommodation on the morning of November 5th. (Aplt. App. at 217). It was not necessary, as the Appellees contend, for accommodations to be requested during the booking process of November 4th. Mr. Robertson had been in contact with his attorney prior to his arrest, and he stated during his deposition that he did not ask to call the attorney again once he arrived at the Detention Center because he did not think that he would be there overnight. (Aplt. App. at 212). When he awoke the next morning, Mr. Robertson followed the directions posted in the cell on how to gain assistance from the guards, which indicated that prisoners must write their request on a piece of paper and drop it through a slot in the cell door. (Aplt. App. at 216-217). After borrowing paper from a fellow inmate, Mr. Robertson deposited a note asking to call his attorney;[5] however, several hours elapsed and his request was not acknowledged. (Aplt. App. at 217).[6] Because the Detention Center failed to place prisoner handbooks in the cells, Mr. Robertson was unaware of any alternative methods of communicating with the staff, and he testified that he never saw an officer pass by the cellblock at any time on the

---

[5] There was a telephone available to all inmates within each pod from the hours of 6:30am – 11:00 pm. Aplt. App., at 206. Mr. Robertson left the note asking to call his attorney because his hearing disability precluded him from using that phone. Aplt. App., at 216.

[6] A genuine issue of material fact exists as to whether Detention Center officials knew or should have known that Mr. Robertson, an individual with a hearing disability, was asking for assistance in placing a telephone call because he could not use the general access telephone. Logically, Mr. Robertson would not have made this request had he been able to use the phone in his pod; he simply would have made the call himself. However, the Detention Center officials never acknowledged the note, and simply left Mr. Robertson to languish in his cell.

day he made his request.[7]  (Aplt. App. at 216).  By ignoring the note, the

Detention Center officials denied Mr. Robertson access to a service that was

offered to all other inmates, thereby violating Title II of the ADA.

> Third, Mr. Robertson stated:
>
> Regarding the video advisory hearing, I was not advised before hand by
> any detention officer where I was being taken.  I was placed in shackles.
> I was not advised as to what the video hearing was for.  I was not advised
> as to what anyone said at the video advisement hearing.  I could not hear
> any of the words being spoken at the video advisement hearing.  There
> was no closed captioning for the hearing impaired on the video system.  I
> was forced to attend a court hearing without being able to hear anything.
> I explained to the detention officer that I couldn't hear.  She did nothing
> about it.  No one at the jail explained to me what the hearing was about.

(Aplt. App. at 305-306).  The Appellees counter that Mr. Robertson was "able

to see the hearing in real time."  (Response at 35).  Seeing, however, is no

substitute for hearing, especially in the context of a court proceeding.

In sum, Mr. Robertson has presented ample evidence to demonstrate that

Detention Center officials were aware of his hearing disability, knew of his

need to place a TTY call to his attorney, and knew that he needed

accommodation so that he could understand the televised advisory hearing.

The Detention Center's administrator admitted that there are no written

procedures for dealing with pre-trial detainees who are deaf or hard of hearing.

---

[7] Department of Justice regulations require a public entity to "make available . . . information regarding the
provisions of this part and its applicability to the services, programs, or activities of the public entity."  28
C.F.R. § 35.106.  The DOJ further explains that "Methods of providing this information include . . . handbooks,
manuals and pamphlets that are distributed . . . to describe such programs and activities."  56 Fed. Reg. 35,694,
35,702 (July 26, 1991).  In addition, the DOJ regulations state that "In providing the notice, a public entity must
comply with the requirements for effective communication in 28 C.F.R. § 35.160."  *Id.*

(Aplt. App. at 203). A detention center officer further stated that "when Gordon Robertson was there in November, 2003, there were no inmate handbooks in the pod." (Aplt. App. at 248). Thus, Mr. Robertson had no means of knowing that he should have sought other ways of attracting attention. Nevertheless, the Appellees argue that Mr. Robertson could have used the intercom system to get the attention of a Detention Officer. However, this argument is belied by detention center officer Ranae Schulte, who stated, "if Gordon Robertson had pushed the intercom and spoken into it, but he didn't respond when an officer answered the intercom, more likely than not, no detention officer would have investigated by walking to the pod. They would have just ignored it as a prank." (Aplt. App. at 248). Therefore, Mr. Robertson followed the only rule of which he was aware, which was the sign posted in his cell informing inmates to write down their requests and deposit them through a slot in the door. (Aplt. App. at 217).

The Appellees claim that "a public entity . . . cannot be held liable for lacking clairvoyance," but it is Mr. Robertson who would have had to be clairvoyant to know what was required to gain reasonable accommodation at the Detention Center.

Mr. Robertson asked to make a call to his attorney. The Detention Center failed to respond. If it had done so, Mr. Robertson would have

communicated, and the Detention Center would have recognized, that a TTY was necessary. Furthermore, "the ultimate issue is not whether the individual requested a particular accommodation, but rather, whether the public entity took appropriate steps to ensure that effective means of communication were provided." *Kennington v. Marion County Sheriff,* 2004 U.S. Dist. LEXIS 19572, *15 (D. Ind. 2004). S*ee also* 28 C.F.R. § 35.160(a); 28 C.F.R. Pt. 35, App. A. In *Kennington*, the court found that a Detention Center complied with Title II's requirements during the booking of a pre-trial detainee with a hearing disability, but failed to provide access to any auxiliary aids or services once that individual was moved onto the cell block. *Id.* at *18. The court further found that this failure constituted a violation of Title II, "particularly where the ADA regulations require a public entity to take appropriate action 'to ensure that communications with' disabled individuals 'are as effective as communications with others.'" *Id.* at *25. Under this reasoning, the Detention Center officials' knowledge of Mr. Robertson's hearing impairment required them to inquire about his need for assistance in making telephone calls or participating in the televised advisory hearing. *See also, Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (holding that a detainee need not request a specific accommodation if the detention center has knowledge of the detainee's hearing impairment).

Finally, the Appellees distort the scope of Mr. Robertson's claim, focusing on the booking process and Mr. Robertson's ability to communicate with the officers immediately upon his arrival.[8]  As Mr. Robertson stated with respect to his arrest and booking, he "had to make the best of it."  (Aplt. App. at 303-304).  However, his claims center on the Detention Center's violation of Title II in its failure to provide a TTY phone and access to the televised advisory hearing.

## CONCLUSION

Reviewing the granting of a motion for summary judgment, the Appellate Court must view the evidence in the light most favorable to the non-moving party to determine whether there are any genuine issues of material fact and whether the District Court has correctly applied the relevant, substantive law. *Bisbee v. Bey*, 39 F. 3d 1096, 1000 (10th Cir. 1994).   Since there are genuine

///

///

///

///

///

---

[8] *Patrice v. Murphy*, 43 F.Supp.2d 1156 (D. Wash. 1999) is easily distinguishable.  There, the arrestee presented no evidence that communication via written notes was ineffective.  In this instance, however, it is clear that Mr. Robertson could not communicate by telephone without a TTY, or benefit from a televised advisory hearing without captions or his physical presence in the courtroom with auxiliary aids and services.

issues of material fact on all issues in this case that must be determined by a

fact finder jury, this Court must reverse and remand on all issues.

Dated this 20th day of September, 2006.

<div style="margin-left: 50%;">

Respectfully submitted,


_____

Virginia H. Louden #4772
Attorney for Plaintiff
267 North Commercial Street
Trinidad, CO 81082
(719) 845-4060

MARC CHARMATZ
Senior Attorney
Meaghan L. Shepard
Law Student
National Association of the Deaf
Counsel for Plaintiff on
ADA Issues
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7732

</div>

**Certificate of Compliance With Rule 32(a)(7)(B)**

The undersigned hereby certifies that the above Reply Brief contains

6535 words as counted by the undersigned's word-processing program and is

printed in the font Times New Roman with a point size of 14.  Accordingly, the

undersigned hereby certifies the Reply Brief is in compliance with Fed. R. Civ.

P. 32(a)(7)(B).

**CERTIFICATION OF DIGITAL SUBMISSION**

I hereby certify that I have not redacted any documents; that every

document submitted in Digital PDF and Scanned PDF Format filed via e-mail

to esubmission@ca10.uscourts.gov is an exact copy of the written document

filed in paper format with the clerk; and that the Digital Submissions have been

scanned for viruses with Grisoft's AVG Anti-Virus Version 7.1, updated today,

and are free of viruses.

Dated September 20, 2006.

s/ Virginia Louden
_____
Virginia H. Louden, Esq.
Attorney for Appellant

<u>Certificate of Service</u>

I certify that true copies of the foregoing Appellant's Reply Brief  were served on September 20, 2006, via electronic email and by depositing a true copy in the U.S. Mail, first class on the following persons:


    Awilda Marquez, Esq.
    Andrew David Ringel, Esq.
    Hall & Evans
    1125 Seventeenth Street #600
    Denver, CO 80202-5817


                          _____
                          Ranae Schulte