06-1027

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

GORDON ROBERTSON,

      Plaintiff-Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF LAS ANIMAS COUNTY
LAS ANIMAS COUNTY SHERIFF'S DEPARTMENT,
LAS ANIMAS COUNTY SHERIFF JAMES CASIAS,
KURT EMERY, and CADE BASSETT,

      Defendants-Appellees.

---

On Appeal from the United States District Court
For the District of Colorado

The Honorable Edward Nottingham, District Judge

D.C. No. 04-CV-2294

---

**APPELLANT'S OPENING BRIEF**

---

Respectfully submitted,
VIRGINIA H. LOUDEN
Attorney for Appellant
267 North Commercial Street
Trinidad, CO 81082
(719) 845-4060

MARC CHARMATZ
Senior Attorney
National Association of the Deaf
Counsel for Appellant on ADA Issues
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7732

## STATEMENT REGARDING ORAL ARGUMENT

Counsel do request oral argument.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ……………………    i

TABLE OF AUTHORITIES ……………………………………….    iv

PRIOR OR RELATED APPEALS ………………………………….    vii

STATEMENT OF JURISDICTION …………………………….....…    1

STATEMENT OF THE ISSUES …………………………………….    2

STATEMENT OF THE CASE …………………………………….…    4

STATEMENT OF THE FACTS …………………………………….....    5

SUMMARY OF THE ARGUMENT ON FALSE ARREST …………....……    25

FALSE ARREST ARGUMENT …………………………………….….    26

    A.  Standard of Review ………………………………………….    26

    B.  Discussion ………………………………………………….    27

I.    Mr. Robertson has sufficiently asserted the violation of a
constitutional right……………………………………………… 28

II.    Deputies Emery and Bassett were plainly incompetent and
knowingly violated the law.  Deputies Emery and Bassett
were not "reasonable, well-trained" deputies……………………29

III.    There are sufficient facts that Deputies Emery and Bassett
violated the U.S. Constitution search and seizure laws by
their criminal trespassing on Mr. Robertson's law without
a search warrant that this case must be tried by a fact-finder
jury……………………………………………………………….. 36

IV.    Appellees have not carried their burden of showing no
material issues of fact remain…………………………………38

V.    Genuine issues of material fact exist that a reasonable
jury could return a verdict for Mr. Robertson………………… 40

CONCLUSION ON FALSE ARREST ISSUES …………………..…….. 41

SUMMARY OF THE ARGUMENT ON ADA CLAIM……………….. 43

AMERICAN DISABILITIES CLAIM ARGUMENT

A. Standard of Review ………………………………………..… 43

B. Discussion ……………………………………………… 44

I.    The District Court erred in granting Summary Judgment for
the Appellees because there were genuine issues of
material fact in dispute as to whether Mr. Robertson was
an individual with a disability under the Americans with
disabilities Act. ……………………………………….. 44

II.    The District Court erred in granting summary judgment
for the Appellees, when there were genuine issues of
material fact in dispute as to whet her Appellees
discriminated against Mr. Robertson and failed to
reasonably accommodate his hearing disability…………… 50

CONCLUSION …………………………………………………...……. 69

STATEMENT REGARDING ORAL ARGUMENT …………………… 70

CERTIFICATE OF COMPLIANCE ………………………….…………….. 71

CERTIFICATE OF SERVICE ……………………………………………… 72

ATTACHMENTS:

Order and Memorandum of Decision ……………………………    A

Final Judgment …………………………………………………    B

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                              **PAGE**

*Albertson's v. Kirkingburg*,
        27 U.S. 555 (1999) …………………….................................... 44

*Albright v. Oliver*,
        10 U.S. 266 (1994) …………………………............................   1

*Anderson v. Liberty Lobby, Inc.*
        477 U.S. 242 (1986) ……………………………………   27, 28, 40

*Bisbee v. Bey*,
        39 F.3d 1096 (10th Cir. 1994)……………………………………….27

*Bonner v. Lewis*,
        857 F.2d 559 (9th Cir. 1988) …………………….…………..  67, 69

*Bragdon v. Abbott*,
        163 F. 3d 87 (1998) …………………………………………...........
44

*Brown v. King County Dep't. of Adult Corrections*,
        998 WL 1120381 (W.D.Wash. Dec. 9, 1998) ……….. …….67, 68, 69

*Calloway v. Boro of Glassboro Department of Police*,
        89 F. Supp. 543 (D. N.J. 2000) ……………………… ...54, 55, 67, 69

*Chisolm v. McManimon*,
        275 F.3d 315 (3rd Cir. 2001) ………   51, 52, 54, 55, 61, 62, 64, 65, 66

*Clarkson v. Coughlin*,
        898 F. Supp. 1019 (S.D.N.Y, 1995) ……………….………….. 67, 69

*Duffy v. Riveland*,
        98 F.3d 447 (9th Cir.1996) ………………….………………  67, 69

*Hannula v. City of Lakewood*,
        907 F.2d 129 (10th Cir. 1990) …………………………………  27

*Hanson v. Sangamon County Sheriff's Dep't*,
        991 F. Supp. 1059 (C.D. Ill. 1998) …………………………….  67

*Helen L. v. DiDario*,
        46 F.3d 325, 331-332 (3d Cir. 1995) ………………………52, 54, 55

*Murphy v. United Parcel Service, Inc.*
        27 U.S. 516 (1999) ………………………………………….  44

*Orsatti v. New Jersey State Police*,
        71 F.3d 480 (1995)………………………………………….  28

*Pennsylvania Dept. of Corrections v. Yeskey*,
        524 U.S. 206 (1998) …………………………………… 51, 54, 55

*Randolph v. Rodgers*,
        170 F.3d 850 (8th Cir. 1999) ……………… ………………  67, 69

*Sutton v. United Air Lines, Inc.*,
        527 U.S. 471 (1999) …………………………………… 44, 47

*Toyota Motor Mfg., Ky., Inc. v. Williams*,
        534 U.S. 184 (2002) ……………………………………….. 44, 46

*Walter v. Morton*,
        33 F. 3d 1240 (10th Cir. Okl 1994) ………………………………..38

-vi-

# **STATUTES**

C.R.S. §18-4-504 …………………..……………………………  4, 37

C.R.S. §18-6-803.5 ………………………………………... …  4

C.R.S. §18-8-502……………………………………………..  30

C.R.S. §18-8-114 …………………………………………….  30

C.R.S. §18-9-111 (4) (b) (III)……………………………….  4

28 U.S.C.A…………………………………………………  1, 27, 43

28 U.S.C. §1291 …………………………………………….  2

28 U.S.C. §1331 …………………………………………….  2

29 U.S.C. §794 …………………………………………….  54, 55

29 U.S.C. §794(b)………………………………………….  55

42 U.S.C. §1983 …………………………………………  1, 5

42 U.S.C. §12101(b)(1)-(2)……………………………………  50

42 U.S.C. §12102 …………………………………………  53

42 U.S.C. §12102 (2)……………………………………………44

42 U.S.C. §12102 (2)(B)……………………………………  48

42 U.S.C. §12131(1)(B) …………………………………….  51

42 U.S.C. §12131(2) …………………………………………  51

42 U.S.C. §12132 ……………………………………………… 51, 54, 55

42 U.S.C. §12134(a). …………………………………………….. 52

## **OTHER**

28 C.F.R. §35, App. A …………………………………………… 51

28 C.F.R. §35.102 ………………………………………..    54, 55

28 C.F.R. §35.104(1). ………………………………………….  53

28 C.F.R. §35.104(1)(B)(ii) …………………………………..  46

28 C.F.R. §35.160 ………………………………………..    53, 59

28 C.F.R. §35.164 ………………………………………..    58, 59

28 C.F.R. §42.503(f)…………………………………………… 56

45 Fed. Reg. 37629-30 (June 3, 1980). …………………………... 56

45 Fed. Reg. at 37630 …………………………………………  56

56 Fed. Reg. at 35699…………………………………………  45

Americans with Disabilities Act

    ("ADA")…………………… 44, 50, 51, 52, 53, 54, 58, 59, 62, 68, 69

Americans with Disabilities Act, Title II …………………………..    66

Civil Rights Act of 1871………………………………………….    1

Rehabilitation Act of 1973, Section 504 ………………… 54, 56, 58, 68, 69

Fed. Rules Civ. Proc. Rule 56 …………………………………… 27

Fed. Rules Civ. Proc. Rule 56(c)……………………………………….    38, 43

S. Rep. No. 890. 95th Cong., 2d Sess. 39 (1978)…………………………. 55

## **PRIOR OR RELATED APPEALS**

There are no other prior or related appeals.

## <u>STATEMENT OF JURISDICTION</u>

Mr. Gordon Robertson, the Plaintiff-Appellant, (hereinafter "Mr. Robertson") filed a complaint (Aplt. App. at 326) in the United States District Court for the District of Colorado under the Civil Rights Act of 1871, 42 U.S.C. §1983, alleging that Appellees Deputy Emery (hereinafter "Deputy Emery") and Bassett (hereinafter "Deputy Bassett") were dishonest, falsified evidence and then maliciously and falsely arrested and imprisoned Mr. Robertson three times without probable cause in violation of his constitutional rights under the Fourteenth Amendment of the U.S. Constitution.   Mr. Robertson in his Response to the Motion for Summary Judgment asked leave of the court to amend his complaint to include a Fourth Amendment violation of the U.S. Constitution. Aplt. App. at 75. The appeal herein assumes the motion to amend would be granted and the analysis is based upon the Fourth Amendment violation.  In *Albright v. Oliver,* 510 U.S. 266 (1994) the Supreme Court held, in plurality, that pre-trial liberty deprivations are governed by the Fourth Amendment.

Mr. Robertson further sued Sheriff James Casias, for a failure to train his deputies so deficient that it can only be called "reckless."

 Further, Mr. Robertson, a profoundly deaf person, sued Sheriff Casias in his official capacity as the Sheriff's Department and the Board of County

Commissioners for Las Animas County (hereinafter collectively named "Appellees") for violations of the American Disabilities Act, when the Las Animas County Detention Center ignored his written request to make a telephone call to his attorney, failed to have a TTY/TDD equipment with which he could make a telephone call, failed to provide captions for the televised advisory court hearing, or, in lieu thereof, take him to the court for the hearing, and otherwise subjected him to discrimination during his detention in the Detention Center. Aplt. App. at 216.

On December 16, 2005, the District Court granted summary judgment in favor of the Appellees on all claims. Aplt. App. at 39. Mr. Robertson made no Motion for Reconsideration of any issue. On January 19, 2006, Mr. Robertson filed a timely appeal. Aplt. App. at 39. The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. The Court has jurisdiction pursuant 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

**FALSE ARREST AND IMPRISONMENT**

1.      Whether the District Court erred in granting summary judgment for the Appellees when there were genuine issues of material fact for a fact finder to determine as to whether the Emery and Bassett had been incompetent, had knowingly violated the law, had been dishonest, had intentionally altered exculpatory evidence, were untrained and not reasonable well-trained officers, and had prevaricated in their affidavits in an attempt to falsely establish probable cause here?

2.      Whether the District Court erred in granting summary judgment for Appellees on the issue of lack of training of Deputies Bassett and Emery that was so deficient as to be reckless, when there were genuine issues of material fact to be determined by a fact finding jury.

## ADA CLAIMS

3.      Whether the District Court erred in granting summary judgment for the Appellees when there were genuine issues of material fact as to whether Mr. Robertson was an individual with a disability under the Americans with Disabilities Act?

4.      Whether the District Court erred in granting summary judgment for the Appellees, when there were genuine issues of material fact in dispute as to whether Appellees discriminated against Mr. Robertson and failed to reasonably

accommodate his hearing disability under Title II of the Americans with

Disabilities Act, 42 U.S.C. §§ 12131-12134 ("ADA").

<u>**STATEMENT OF THE CASE**</u>

Mr. Robertson was arrested in Las Animas County, Colorado for alleged

violations of:

C.R.S. 18-6-803.5, (Class 2 M), misdemeanor violation of civil restraining

order,

C.R.S. 18-4-504, Third Degree Criminal Trespass (Class 5 Felony), and

C.R.S. 18-9-111 (4) (b) (III), Stalking (Class 5 Felony),

In Las Animas District Court Case No. 03 CR 250, (Aplt. App. at 226) on

November 4, 2003.  Defendant Kurt Emery based the arrest on his Affidavit for

Warrantless Arrest.  Mr. Robertson was imprisoned and the case was dismissed on

November 5, 2003 for lack of probable cause by state District Court Judge George

Newnam.

Mr. Robertson was again arrested by Defendant Kurt Emery on December 2,

2003 for alleged violations of the same charges as November 4, 2003, on a

Warrant obtained through an Affidavit for Warrant signed by Defendant Kurt

Emery in Las Animas District Court Case No. 03 CR 256. (Aplt. App. at 324).    A

search warrant was also issued and executed against Mr. Robertson's home based

upon a similar Affidavit.   The case was dismissed pursuant to a Motion to Dismiss

Based on False Affidavits on August 30, 2004 by Chief Judge Claude Appel.  Aplt. App. at 292.

Mr. Robertson was arrested on February 12, 2003 by Defendant Kurt Emery for alleged violations of the same statutes as November 4 and December 2, 2003, (Aplt. App. at 325) based upon an Affidavit for Warrantless Arrest for violation of a restraining order.  This case, 04 M 66, was dismissed on December 14, 2004 on motion of the district attorney's office on the grounds that the District Attorney did not believe he could prove the case beyond a reasonable doubt.  Aplt. App. at 300.

Mr. Robertson sent of intent to sue on May 3, 2004.  On November 4, 2004, Mr. Robertson filed his complaint in this instant case in the United States District Court for violations of 42 U.S.C. § 1983 and for violations of the American Disabilities Act.   The U. S. District Court granted Defendants' Motion for Summary Judgment on all counts and dismissed the case on December 16, 2005.

## STATEMENT OF THE FACTS

### EARLY HISTORY OF MR. ROBERTSON AND THE MURNANES

Mr. Robertson owns nine acres in Las Animas County and lives there with his deaf niece.  His house sets in the middle of the nine acres and has open porches on the northeast and west sides.  Mr. Robertson was attempting to grow many trees, shrubs and plants on his nine acres which often took him out of the house onto his own property.  His neighbor, Terri and John Murnane, with their several

children, live in a modular home on rented property on the North side of Mr.

Robertson's property.  The house is at least a football field distant from Mr.

Robertson's house.  Aplt. App. at 30 and 302.

Mr. Robertson, now age sixty-two, is a disabled veteran, having been

declared hearing impaired in his twenties while he was in the Air Force and

completely profoundly deaf in his forties.  Aplt. App. at 303.  He lives on his

disability and social security payments and does attempt to eke out further income

by teaching gunsmithing and selling molds for replication of antique guns.  Aplt.

App. at 213, 213A, 213B, 336.    In approximately 1991 the Veterans

Administration had a cochlear implant[1] inserted behind Mr. Robertson's right ear.

Aplt. App. at 303.  The cochlear implant allows him to hear some persons speaking

---

[1] [1] "A cochlear implant is an implanted electronic hearing device, designed to produce
useful hearing sensations to a person with severe to profound nerve deafness by
electrically stimulating nerves inside the inner ear.

"These implants usually consist of 2 main components:

- The externally worn microphone, sound processor and transmitter system.
- The implanted receiver and electrode system, which contains the electronic
  circuits that receive signals from the external system and send electrical currents
  to the inner ear.

"Currently made devices have a magnet that holds the external system in place next to the
implanted internal system. The external system may be worn entirely behind the ear or its
parts may be worn in a pocket, belt pouch, or harness."   See
http://www.fda.gov/cdrh/cochlear/WhatAre.html.

"An implant does not restore or create normal hearing. Instead, under the appropriate
conditions, it can give a deaf person a useful auditory understanding of the environment
and help him or her to understand speech."   See
http://www.nidcd.nih.gov/health/hearing/coch.asp.

to him within two-three feet.  Beyond the two-three feet, the persons must be facing him so that he can lip read, but, even then, he cannot lip read everything that persons are saying.  Aplt. App. at 302.  Mr. Robertson cannot hear from any electronic device, i.e., television, radio, or telephones.  Aplt. App. at 303.  His daily activities are highly impacted by his inability to make a telephone call, hear a telephone ring, listen to a radio or television, or hear beyond two to three feet.  He cannot hear in large rooms.  He talks in a louder than normal voice.  Aplt. App. at 214.

Mr. Robertson came to Trinidad, Colorado from Missouri in the 1990's to study at the Trinidad State Junior College Gunsmithing School.  Aplt. App. at 335.  After Mr. Robertson moved into his house, the Murnane children came over to the Mr. Robertson's home constantly. Aplt. App. at 184.  Mr. Robertson has a workshop on his property where he works as a machinist on gunsmithing and other projects. Aplt. App. at 180.   The two families were friendly.  They would have dinner together and Mr. Robertson even gave a house key to Mrs. Murnane in March, 2003 so that she could feed the Robertson animals while Mr. Robertson and his niece traveled to Florida.  Aplt. App. at 337.

By June, 2003, Mr. Robertson was virtually babysitting the Murnane children daily.  He worried about the children becoming injured on his property, especially since he was deaf and was often in his workshop where he could not see or hear the children.   The children desperately needed attention from Mr.

Robertson and their constant presence without supervision of their mother became

a nuisance, as well as a worry, to Mr. Robertson.  Aplt. App. at 338.      In or

about June, 2003, Mr. Robertson requested John Murnane to keep his children at

home.  Aplt. App. at 338.

## CHILDREN STARTED STORY TELLING

Thereafter, the Murnane children commenced telling false stories about Mr.

Robertson.   In September, 2003, unbeknownst to Mr. Robertson at that time, the

children started saying that someone was at the rear of the Murnane house

attempting to turn doorknobs, make the dog bark and frightening them.   Mrs.

Murnane started calling the Sheriff whenever the children complained.   Aplt. App.

at 212A, 286.

The first accusation was on a night that Mr. Robertson was bowling in

Trinidad--September 19, 2003.    Mr. Robertson was an avid bowler and would

bowl two or three nights a week.  Aplt. App. at 289 to 291.  Had the Sheriff

Deputies Emery and Bassett checked with Mr. Robertson on the first accusation,

they would have learned of the bowling and perhaps become more suspicious of

the children's tales.    Aplt. App.289.

## SURVEILLANCE

In September, 2003, unbeknownst to Mr. Robertson, Las Animas County

Sheriff Deputies Bassett and Emery, in an effort to gather evidence to support the

children's false stories, and in an effort to "apprehend" Mr. Robertson in action,
conducted extra patrols and conducted many nighttime surveillances of Mr.
Robertson's house.  Bassett and Emery would lay in the prairie fields on the
neighbor's properties watching Mr. Robertson's house for hours.    In truth, they
were trespassing on and up close to Mr. Robertson's house.   Despite many patrols
and surveillances from September through November, 2003, Bassett and Emery
testified at their depositions that they never saw Mr. Robertson leave his own
property.   Aplt. App. at 158 and 177.


## CIVIL RESTRAINING ORDER OBTAINED

On or about October 16, 2003 the Murnanes acquired an *ex parte* temporary
civil restraining order in Las Animas County Court Case No. 05 C 673 against Mr.
Robertson based upon the children's accusations. Aplt. App. at 150.

On or about October 30, 2003, the County Court Judge acquired a
stipulation from the parties for a mutual restraining order and a continuance to
November 13, 2003 so that the Murnanes could acquire counsel if they desired.
No testimony was given at that time.  Aplt. App. at 152.


## DEPUTY BASSETT ALTERED AND FALSIFIED EVIDENCE

Despite the hard evidence that for two months of surveillance, Mr.
Robertson never left his property, Bassett and Emery pursued the unsubstantiated

allegations and changed their own basic surveillance evidence in an attempt to

fabricate an arrest warrant and create an illusion of probable cause.

Deputy Bassett wrote in his daily log for September 25, 2003:

"20:30 to 23:10"  "Savelance (sic) at CR 89.7/suspect     was
observed standing outside of his residenck (sic)     however he did not
approach the victims residence."

Aplt. App. at 252.

Deputy Bassett intentionally altered that exculpatory evidence for an

"Affidavit for Arrest Warrant," into:

"On September 25, 2003 at approximately 2030 hours Deputy Elliot
Grubert dropped your Affiant off at the intersection of CR 89.7 and Hwy.
160.  Your Affiant approached Mrs. Murnanes (sic) residence on foot and
watched the residence from a neighboring field.  At approximately 2200
hours your Affiant observed the suspect (Gordon Robertson) exit his
residence and begin to walk across his property toward Mrs. Murnane's
residence.

"As Mr. Robertson approached Mrs. Murnane's fence, your Affiant
observed a vehicle traveling on CR 89.7 in the direction of Mrs. Murnane's
residence.  Your Affiant observed the suspect turn and begin walking back
to his residence.  The vehicle appeared to deter the suspect.  Your Affiant
observed the suspect walking around his residence shining a flashlight, then
enter his residence.  The suspect did not cross onto the Murnane's property."

Aplt. App. at 320.

In deposition, Deputy Emery admitted that he was Deputy Bassett's

supervisor:  Aplt. App. at 187.

Q. Was there any criticism of you or reprimand of you by Sheriff
Casias before you left Las Animas County?
A. Yes.

R.  And what, a criticism or reprimand?
A.  I was actually written up for Kade's driving.
Q.  For his driving?
A.  Driving, yes.
Q.   He had a ticket or something?
A.  No. No.  He damaged a Durango, one of our patrol units.
Q.  And, why were you written up?
A.  Because I was his supervisor.

As Bassett's supervisor, Deputy Emery is liable for Bassett's falsified evidence just as Deputy Emery was responsible for Bassett's damaging a Durango. Emery admitted, as Bassett's supervisor, of signing Bassett's reports.  Aplt. App. at 172.  The altered, false testimony of Deputy Bassett was used by Deputy Emery in all three Affidavits from November 4, 2003 through February 12, 2004.   Three arrests of an innocent man were based upon intentionally false statements of Deputy Bassett.

In deposition in this case in May, 2005, Deputy Bassett changed the tale again, testifying that he saw a figure (presumably Mr. Robertson) walk only "half-way" to Murnane's house, rather than his seeing Mr. Robertson "approach Mrs. Murnane's fence"  as he stated in his Affidavit.  Since the Murnane fence is at least 200 feet from the Robertson house, half-way is only 100 feet and still 100 feet from the fence from "approaching Ms. Murnane fence."   That's a 100 foot difference between the two fabricated tales.  See aerial photos. Aplt. App. at 314.

Further Bassett testified in deposition that he was laying on the ground and that a great portion of the Robertson property was invisible to him, and that he was

not 100% sure where the figure went or that the figure was Mr. Robertson.  Aplt

App. at 159 and 160.

Bassett's altered his statement to say that a vehicle deterred Mr. Robertson

from proceeding to Mrs. Murnane's.   A car on County Road 89.7 would have been

behind the Robertson house from where Mr. Robertson was allegedly walking if he

had been indeed "approaching Mrs. Murnane's fence."  Being deaf and unable to

hear beyond two to three feet, Mr. Robertson could not, of course, have heard any

car behind him.   Nor could Mr. Robertson have seen a car because if he had been

"half-way" to the Murnane residence--he would have been north of his own house,

and the house blocked view of County Road 89.7.   See aerial photo at Aplt App. at

314.

## STATE DISTRICT COURT JUDGE NEWNAM THROWS OUT
## THE AFFIDAVIT OF BASSETT

Despite Deputy Bassett's best efforts in late October, 2003 at falsifying

evidence to obtain an arrest warrant for stalking, Judge Newnam refused to issue

an arrest warrant ruling that Bassett's Affidavit did not have probable cause.

Aplt. App. at 172.

## DEPUTY EMERY TRESPASSES WITHOUT WARRANT
## ON ROBERTSON PROPERTY

During September and October, 2003, Deputies Emery and Bassett spent a great deal of Sheriff's Department's assets and time in surveillance with no results except more evidence of Mr. Robertson's innocence.   Rather than accept that Mr. Robertson was innocent, Deputy Emery became emotionally fixated on Mr. Robertson, lost his neutral approach to the investigation, and projected onto Mr. Robertson's actions a motivation that Deputy Emery wanted to have happen, rather than what was really happened—nothing.

In deposition, Deputy Emery tells how, while doing surveillance allegedly from the Cummings property 400 feet away, he saw Mr. Robertson come out to his rear north porch, stand there looking north towards Murnane's house (and the beautiful mountains northward), and "adjust his waistline."   Deputy Emery fabricates that movement into a "man who had something in mind," and that Mr. Robertson's walking onto his own rear porch was "approaching Mrs. Murnane's property" some 300 feet away.   Aplt. App. at     177, 309.


Q. Did you ever see him approaching Mrs. Murnane's property?

A. Yes.
. . .

A.  About five minutes later, he came out, walked onto the porch.  He was looking over at the Murnanes'.  He was looking at the Murnanes' and kind of adjusting his waistline like this (indicating).  And started to walk toward their residence.  And, as he got to the stairs, he looked in my direction and stopped.  Looked back at the Murnanes'.  And then he turned around and went back inside the house.

The rear north porch has no stairs and the Murnane house is 300 feet away.  See

Photo at Aplt. App. at 314.

Emery indicates his improper emotional involvement in the case even more

clearly as he states:

> A.  He gets to the edge of the porch.  He stops.  He looks in my direction;
> (ed. 400 feet away) looks directly at me as if I'm waving a flag. Looks
> back at the Murnanes.  Turns, and goes back in.
> Q. And what did you take from that?
> A. I took that—that we interrupted whatever he was going to do.

Aplt. App. at 179.


 Further, Deputy Emery was so emotionally vested into trying to prove Mr.

Robertson guilty, that he trespassed onto Mr. Robertson's property while doing the

surveillance.   Emery testified:


> I believe it was Cummings.  Wait a minute.  Mr. Cummings, I believe his
> fence comes acrost (sic) down here (indicating).  I don't know.  There was a
> fence that we crossed and walked back here (indicating).


Aplt. App. at 178.

There is only one fence between the Robertson and Cummings property.

When Deputy Emery crossed it, going in either direction, he trespassed onto the

Robertson property without a warrant.   See photos, Aplt. App. at 314.

**DEPUTY EMERY ARRESTS MR. ROBERTSON**

Despite Judge Newnam's refusal to issue an arrest warrant for stalking in October, 2003 for Deputy Bassett, Deputy Emery was not deterred.   Deputy Emery, on November 4, 2003, took the altered, falsified words of Bassett's Affidavit, and added a paragraph that the thirteen year old, Samantha, had informed him that she had seen Robertson peering through her bedroom window. Emery did not include a date of occurrence.  See November 4, 2003 Affidavit for Warrantless Arrest.  Aplt. App. at 155 and 156.

Without first having Judge Newnam re-review the new Affidavit, Deputy Emery arrested Mr. Robertson on November 4, 2003 based on this "NEW" "Affidavit for Warrantless Arrest,"    Aplt. App. at 155.   Only the first paragraph was written by Emery. Aplt. App. at 287.  The remaining two pages of allegations were an unsigned duplicate of the Bassett Affidavit previously thrown out by Judge Newnam.  Aplt. App. at 285 and 286.

## MR. ROBERTSON INCARCERATION OVERNIGHT

## NO TTY/TDD EQUIPMENT

## TELEVISED ADVISORY COURT HEARING INACCESSIBLE

Mr. Robertson was incarcerated in the Detention Center for the night of November 4, 2003.   Aplt. App. at 227.  Emery testified that he believed he informed the Detention Officers that Mr. Robertson was hearing impaired.   Aplt.

App. at 189.  The Detention Officers inventoried batteries for the cochlear implant.
Aplt. App. at 229.

   In the Intake process, Mr. Robertson denied any "health" problems.  Mr.
Robertson looks upon his deafness as a "communication" problem and a disability.
Since he is not "sick" from it, he did not require medical assistance when he was
incarcerated.   The U.S. District Court and the Appellees in this case used his one-
word answer of "No" to a question of health problems as a basis for ruling that Mr.
Robertson was not an individual with a disability.   Aplt. App. at 214.

   Upon conclusion of the booking process, Mr. Robertson was placed in a
"pod" which contained several individual jail cells.   A detention officer came
through the hallway of the jail, outside of the pod, during the evening.  Mr.
Robertson requested both an extra shirt because he was cold and a roll of toilet
paper.  That night he made no further requests.  At 11 p.m. the lights went out and
Mr. Robertson went into his individual cell for the night.  The cell was
automatically locked.  The next morning, when Mr. Robertson woke up, his jail
cell door was unlocked and opened.  A cold breakfast had been placed on a table.
Mr. Robertson then saw a sign stating that if he needed to contact someone to leave
a written message in the door slot.  Aplt. App. at 216, 217.

   Mr. Robertson obtained a pencil and paper from his fellow inmate and wrote
a message that he wanted to make a telephone call to his attorney.  He placed the
message in the slot in the pod door about mid-morning on November 5, 2003.  No

detention officer responded to the message.  When Mr. Robertson was taken to the television advisory room at 1:30 p.m., he still had not had contact with his attorney.  In the pod was a telephone which the other inmate used to make calls to anyone he pleased using a calling card or calling collect.   Mr. Robertson's deafness excluded him from use of the telephone.   Aplt. App. at 216 through 218.

During the entire morning, no detention officer came down the hallway and no detention officer responded to Mr. Robertson's written request to make a telephone call.   Mr. Robertson could not call his attorney, his family or friends.  Mr. Robertson did not know what was happening.   Aplt. App. at 217 and 218.

At approximately 1:30 p.m. a detention officer took Mr. Robertson to another room, where he was handcuffed to a bench, facing forward towards a television screen, with his feet shackled.  He was given no explanation as to why he was there.  Aplt. App. at 218 and 219.

Mr. Robertson was not told by anyone that this was a televised advisory court hearing.   Eventually, he saw the judge and his attorney on the screen.  He could not hear what was happening.  He could not assist his attorney.  He could not answer questions of the judge.   Other inmates were present and were answering questions put to them by the judge.  He could not hear the judge's advisement to him, or even if there was an advisement.   The court advisory hearing was not recorded.  Aplt. App. at 305, 306.

## JUDGE NEWNAM DISMISSES THE CASE

## FOR LACK OF PROBABLE CAUSE

In the jury room at the courthouse at approximately 1:30 p.m. on November 5, 2003, Judge Newnam held the televised advisory hearing.   Judge Newnam read the Affidavit for Warrantless Arrest, (Aplt. App. at 202), and ruled that the Affidavit was inadequate to show probable cause.  He dismissed the case at the televised advisory hearing and ordered the Detention Center to immediately release Mr. Robertson.  Aplt. App. at 154.

Emery, in his deposition, testified that he had a meeting with Judge Newnam sometime after November 5, 2003.  Emery testified that Judge Newnam was incensed that Emery had used the same words that the Judge had seen in the October Bassett Affidavit to arrest Mr. Robertson on a "Warrantless" Affidavit. Aplt. App. at 181.

> A.  He [Judge Newnam] was angry that the—Kade Bassett's verbiage was back in front of him that he had thrown out.  I felt like he didn't look at even what I had written.

## MR. ROBERTSON PURCHASES SURVEILLANCE SYSTEM
## FOR PROTECTION FROM THE LIES

On November 5, 2003, after being released from jail, Mr. Robertson purchased an extensive camera surveillance system and installed it on the inside of his own home, taping himself, so that he could have evidence as to his being in his

own home at the time of these children's continuous false accusations. He later

installed cameras on the outside of his house so that he would have proof of

exactly when he left his residence.   Aplt. App. at 311.

## COUNTY COURT TOOK TESTIMONY

## IN CIVIL CASE

On the afternoon of November 13, 2003, the Murnanes put on their case for

a permanent civil restraining order in Las Animas County Court Case 2003 C 673

before Judge Billings.    Aplt. App. at 230A.  The time ran short and Mr.

Robertson's defense could not be heard.  The matter was continued to December 9,

2003.

During the Murnane presentation, Samantha, then age 13, testified that on

the night ("about a week ago) of Tuesday, she and her brother were playing in their

car in the driveway (the driveway is in front of their house, (see photos Aplt. App.

at 314) waiting for their mother to go to Wal-Mart.  She testified that her brother

was turning on and off the lights of the car.  She testified that it was approximately

7:30 p. m., and that she saw Mr. Robertson near a trailer on their property in the

backyard (even though she was in the parked car in the front yard) and that Mr.

Robertson ran in the opposite direction away from his own house.

This sworn testimony directly contravened Deputy Emery's affidavit of

November 4, 2003.   Deputy Emery stated that Samantha had informed him that

Mr. Robertson had peered into her bedroom window that she and her brother were playing in her bedroom that he was turning on and off the lights in the bedroom and that Mr. Robertson had run towards his house.         (Aplt App at 155)

Samantha is the only person who could have verified Deputy Emery's affidavit, yet she contradicted his details.   The only thing consistent was that she said she saw Mr. Robertson.   Mr. Robertson's position is that Deputies Emery and Bassett couldn't obtain corroborating evidence, had already shown that they were willing to unlawfully alter evidence, and that they attempted to coach Samantha on November 4, 2003.   The coaching was only partially successful.   Perhaps her confused testimony is the only thing she, as a child, could remember about Deputy Emery's instructions to her thirteen days later.   Or could Samantha have become confused as to which of the many stories she was supposed to tell on the witness stand, under oath.   Aplt. App. at 233.


### DECEMBER 2, 2003 ARREST AND
### SEARCH OF MR. ROBERTSON HOUSE

Despite the sworn testimony of Samantha that contradicted Deputy Emery, on December 2, 2003, Emery wrote another Affidavit stating that Mr. Robertson peered into Samantha's bedroom window on November 4, 2003 and inserted it into a new Affidavit for Warrant for the December 2, 2003 arrest.     Aplt. App. at 320.

On December 2, 2003, based on Deputy Emery's adding November 4, 2003 as the date, District Court Judge Newnam signed an Arrest Warrant for Mr. Robertson.   Both this warrant and a search warrant were based upon Emery's and Bassett's false statements in their Affidavit. Aplt. App. at 293.          Mr. Robertson was again arrested on felony charges at his home on the night of December 2, 2003.   Aplt. App. at 324.  Mr. Robertson's house was searched and property seized--computers used to make TTY-type relay calls, were taken, among other items.   Thus, once he bonded out, Mr. Robertson was deprived of his equipment to make TTY/TDD calls from his home.   Mr. Robertson's video tapes from his own surveillance cameras, accumulated since November 5, 2003, were also seized.   Aplt. App. at 298.

Mr. Robertson was able to post bond within a few hours and not spend the night in jail.   While there, Mr. Robertson could not make any telephone calls to his attorney, friends or family as there was no TTY or TDD equipment at the Detention Center.   Aplt. App. at 304.

Captain Kimbal Nichols, the Detention Center administrator, testified at his deposition that the Detention Center had no TTY/TDD equipment until September of 2004.   Aplt. App. at 202.

**MORE FALSE STORIES FROM THE CHILDREN, JANUARY, 2004**

While the felony charges were pending, in January, 2004, Samantha

accused Mr. Robertson of following her school bus with his red truck, of driving to

her school and of coming onto the playground where he allegedly harassed her and

another child.   Aplt. App. at 182 and 183.  The District Attorney refused to file

charges as the "other child" could not recognize Mr. Robertson in a photo lineup.

Deputy Emery went to the Hoehne school to investigate.  He stated in his

deposition that no school personnel could identify Mr. Robertson.  Aplt. App. at

182 and 183.  The red truck was with Mr. Robertson's niece on the East Coast in

January, 2004.  Aplt. App. at 183.


**ANOTHER FALSE ARREST, FEBRUARY, 2004**

Still Deputy Emery was not deterred.  On February 12, 2004, Terri Murnane

made an additional complaint to the Sheriff's Department alleging that Mr.

Robertson trespassed and had been seen standing by a trailer on February 10, 2004.

Why it took Terri Murnane two days to make the complaint was never explained.

Deputy Emery knew that Mr. Robertson had a surveillance system both inside and

outside the house as Emery had seized surveillance video tapes in the search on

December 2, 2003.  Nonetheless Deputy Emery arrested Mr. Robertson on

February 12, 2004, and when requested by Mr. Robertson to examine the video

tapes, Emery refused, stating that he had already investigated enough.    Aplt. App.

at 222.  Mr. Robertson again bonded out.  Prior to being bonded out, Mr.

Robertson had no opportunity to make a telephone call to attorney, friends or family as there was no TTY/TDD equipment.   Aplt. App. at 197.

## DISMISSAL OF DECEMBER 2, 2003 FELONY CHARGES
## AS BASED ON FALSE AFFIDAVITS

The December 2, 2003 felony charges in 2003 CR 256 were dismissed on August 30, 2004 when the Third Judicial District Chief Judge Claude Appel granted plaintiff's Motion to Dismiss All Counts as Based on False Affidavits. Aplt. App. at 292.

## DISMISSAL OF FEBRUARY 12, 2004 CHARGES BY D.A.

The February 12, 2004 charges, Las Animas County Court Case No. 04 M 66 were dismissed on December 14, 2004 when the Deputy District Attorney made a motion to dismiss on grounds that the people did not believe they could prove a case beyond a reasonable doubt.  Aplt. App. at 299.

## SUMMARY OF THE ARGUMENT

## FALSE ARREST AND IMPRISONMENT ISSUES

## I.    Mr. Robertson has sufficiently asserted the violation of a constitutional right.

**II.   Deputies Emery and Bassett were plainly incompetent and knowingly violated the law.  Deputies Emery and Bassett were not "reasonable, well-trained" deputies. They had an improper investment into, and emotional attitude towards, this case projecting fictional criminal intent onto Mr. Robertson.**

**III.   There are sufficient facts that Deputies Emery and Bassett violated the U. S. Constitution search and seizure laws by their criminal trespassing on Mr. Robertson's land without a search warrant that this case must be tried by a fact-finder jury.**

**IV.  Appellees have not carried their burden of showing no material issues of fact remain.**

**V.  Genuine issues of material fact exist that a reasonable jury could return a verdict for the nonmoving party—Mr. Robertson.**

## ARGUMENT ON THE FALSE ARREST AND IMPRISONMENT ISSUES

### A.    Standard of Review

This Court exercises plenary review over the grant of summary judgment, applying the same standard that the lower court should have applied. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A. The appellate court views the evidence in the light most favorable to the non-moving party to determine whether there are any genuine issues of material fact and whether the district court has correctly applied the relevant substantive law. *Bisbee v. Bey,* 39 F.3d 1096, 1100 (10th Cir.1994).

Summary judgment decisions involving a qualified immunity defense are treated somewhat differently than other summary judgment rulings." *Hannula v. City of Lakewood,* 907 F.2d 129, 130 (10th Cir.1990).    A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Summary judgment is improper so long as the dispute over the material facts is genuine. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.   The standard for determining the reasonableness of an official's belief in the existence of probable cause is whether a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he therefore should not have applied for the warrant under the conditions. *Id.* at 345, 106 S.Ct. at 1098.   But not every officer is deemed "reasonably well-trained."   This standard does not protect "the plainly incompetent or those who knowingly violate the law."[2]

## B.  <u>ARGUMENT ON FALSE ARREST AND IMPRISONMENT</u>

## <u>I</u>

**Mr. Robertson has sufficiently asserted the violation of a constitutional right.**

---

[2] *Orsatti v. New Jersey State Police*, 71 F.3d 480 at 484, C.A.3 (N.J.),1995.

It is clear that under the Fourth Amendment of the United States Constitution, unlawful seizure and searches, false arrests and imprisonment, occur when there is no probable cause.  Mr. Robertson asserts that he was arrested and imprisoned, not once, but three times by Deputy Emery on the basis of Affidavits containing intentionally falsified evidence.  Evidence falsified by both Deputy Bassett and his supervisor, Deputy Emery due to their improper involvement and motivation in the case, tainted their Affidavits.

## II.

**Deputies Emery and Bassett were plainly incompetent and knowingly violated the law.  Deputies Emery and Bassett were not "reasonable, well-trained" deputies.  They had an improper investment and emotional attitude towards this case projecting fictional criminal intent onto Mr. Robertson.**

Deputy Bassett wrote in his daily log for September 25, 2003:

"20:30 to 23:10"   "Savelance (sic) at CR 89.7/suspect was observed standing outside of his residenck (sic) however he did not approach the victims residence."   Aplt. App. at 252.

In an "Affidavit for Arrest Warrant," Deputy Bassett intentionally altered that exculpatory evidence of September 25, 2003 into:

"On September 25, 2003 at approximately 2030 hours Deputy Elliot Grubert dropped your Affiant off at the intersection of CR 89.7 and Hwy. 160.  Your Affiant approached Mrs. Murnanes (sic) residence on foot and watched the residence from a neighboring field.  At approximately 2200 hours your Affiant observed the suspect (Gordon Robertson) exit his residence and begin to walk across his property toward Mrs. Murnane's residence.

"As Mr. Robertson approached Mrs. Murnane's fence, your Affiant observed a vehicle traveling on CR 89.7 in the direction of Mrs. Murnane's residence.  Your Affiant observed the suspect turn and begin walking back to his residence.  The vehicle appeared to deter the suspect.  Your Affiant observed the suspect walking around his residence shining a flashlight, then enter his residence.  The suspect did not cross onto the Murnane's property."

Aplt. App. at 320.

As Deputy Bassett's supervisor, Deputy Emery is equally responsible for the falsified evidence.  Aplt. App. at 172.  Falsifying evidence is a felony, punishable as perjury under C.R.S. § 18-8-502 Perjury[3] in the first degree, and is a misdemeanor under C.R.S. § 18-8-114. Abuse of public records.[4]

---

[3] § 18-8-114. Abuse of public records
(1) A person commits a class 1 misdemeanor if:
(a) The person knowingly makes a false entry in or falsely alters any public record; or
(b) Knowing the person lacks the authority to do so, the person knowingly destroys,

During September and October, 2003, Deputies Emery and Bassett spent a great deal of Sheriff's Department's assets and time in surveillance with the only result being more evidence of Mr. Robertson's innocence.   Rather than accept that Mr. Robertson was innocent, Deputy Emery clearly became emotionally fixated on Mr. Robertson, lost his neutral approach to the investigation, and projected onto Mr. Robertson's actions a motivation a criminal nature and worked at false prosecuting him.

In deposition, Deputy Emery expressed his frustration at Judge Newnam's dismissal of the first arrest.  Rather than learning from the dismissal, he felt abused:  Aplt. App. at 181:

> A :  He [Judge Newnam] was angry that the—Kade Bassett's verbiage was back in front of him that he had thrown out.  I felt like he didn't look at even what I had written.

Deputy Emery's frustration also was evidenced in his projecting criminal intent and suspicion onto Mr. Robertson's totally innocent behavior.  Deputy

---

mutilates, conceals, removes, or impairs the availability of any public record; or
. . .
(2) As used in this section, the term "public record" includes all official books, papers, or records created, received, or used by or in any governmental office or agency.

[4] C.R.S. § 18-8-502 Perjury
(1) A person commits perjury in the first degree if in any official proceeding he knowingly makes a materially false statement, which he does not believe to be true, under an oath required or authorized by law.
(2) Knowledge of the materiality of the statement is not an element of this crime, and the defendant's mistaken belief that his statement was not material is not a defense, although it may be considered by the court in imposing sentence.
(3) Perjury in the first degree is a class 4 felony.

Emery tells how, (while doing surveillance allegedly from the Cummings property 400 feet away and allegedly on the other side of the house), he saw Mr. Robertson come out to his rear north porch, stand there looking north towards Murnane's house (and the beautiful mountains northward), and "adjust his waistline." Deputy Emery fictionalizes that movement into a "man who had something in mind."     Aplt. App. at 179.

> A:  That's right.  And he's looking at the Murnanes like he has  something in mind.

Deputy Emery then projects Mr. Robertson's walking onto his own rear porch (some 300 feet from the Murnane house) as "approaching Mrs. Murnane's property."     Aplt. App. at 177.

> Q: Did you ever see him approaching Mrs. Murnane's property?
> A: Yes.
> . . .
>
> A.  About five minutes later, he came out, walked onto the porch.  He was looking over at the Murnanes'.  He was looking at the Murnanes' and kind of adjusting his waistline like this (indicating).  And started to walk toward their residence.  And, as he got to the stairs, he looked in my direction and stopped.  Looked back at the Murnanes'.  And then he turned around and went back inside the house.

The rear north porch has no stairs and the Murnane house is 300 feet away.   From his alleged vantage point of 400 feet away on the Cummings property on the south side of the Robertson house, in the dead of a dark night, it is incredulous that

Emery and Bassett could see where Mr. Robertson was looking or what he was

doing on the north porch.  Aplt. App. at 314.

There is simply no method by which Deputy Emery knew what Mr.

Robertson was thinking.  Emery further indicates his improper emotional

involvement in the case even more clearly as he states:

> A:  He gets to the edge of the porch.  He stops.  He looks in     my
>      direction; (ed. 400 feet away) looks directly at me as if I'm
>      waving a flag. Looks back at the Murnanes.  Turns,          and goes
> back in.
> Q:  And what did you take from that?
> A:  I took that—that we interrupted whatever he was going to do.

>      Aplt. App. at 180.

Deputy Emery was so emotionally invested in this case that he apparently

believed that it was suspicious (Aplt. App. at 179) for a man on his own nine acres

to come out to his rear porch (a football field away from the Murnane house),

adjust his waistline, tuck in his shirt or otherwise adjust his belt, and look

northward.   Deputy Emery's testimony clearly indicates how desperate he felt in

not being able to prove an innocent man guilty.

## EMERY TRAINING

Deputy Emery is incompetent to be a sheriff's Deputy.  He

had to take the post certified training, not once, but twice in

order to become a sheriff's Deputy.  Nor was he trained or re-

trained at the Las Animas Sheriff's Department.

Deputy Emery began work at the Arapahoe Sheriff's

Department in 1988.  (Aplt. App. at 168) Prior to that he went to

the Sheriff's post certification academy at Arapahoe Community

College in 1987, but didn't earn post-certified.  In 1991 or 92

(Aplt. App. at 168), he attended a second academy, took the

entire course again, and finally became post-certified.

Emery testified at his deposition as follows (Aplt. App. at

168):

    Q:  How long did you go the second time?
    A:  The same.  It was the same course.
    Q:  It was the same course, but this time they post-certified you.
    A:  Correct.
   . . .

Regarding probable cause (Aplt. App. at 169):

    Q:  Okay, so, considering that you made that decision to arrest                someone on probable cause, can you explain to me, what you          believe to be probable cause?

    A:  At the time I made those arrests, I'm in that line of work, and                I have the books all over my desk.   So I can look at them                   frequently.  I've been away from that department for—since                May of 04.  I haven't looked at a law book since I left.

Regarding probable cause (Aplt. App. at 174)

Q:  Okay.  So, does that tell you that these documents—this document          did not have probable cause for the warrantless arrest?

Ms. Marquez:  Objection.  No foundation. And, Objection, he's not          competent to testify as to the probable cause of that document.
     . . .

Ms. Louden:  I would represent that he is competent to testify to          that, because he was the man who was arresting people based          on this document.

Ms. Marquez:  He's not competent to give a legal conclusion about          probable cause.  . . .


Regarding training:  Aplt. App. at 175:

Q:    Okay.  Did you ever get any training in dealing with
          deaf people?

A:    Training?

Q:    Training.  At any of these academies that you attended, did they          ever give you any training, one-day training, two-hour training,          any kind of training in how to – how to deal with a deaf person          that you want to talk to?

A:    I would have to look at the records to see if that was
          in there or not.

Regarding training from Undersheriff Derek Navarette Aplt.

App. at 188:

    Q:  Did Derek Navarette train you in investigation
procedures?
    A:  No.
    . . .

    Q:  Did Sheriff Casias train you in investigative procedures?
    A:  No.


The following is from Sheriff Casias' deposition:  (Aplt. App.

at 195)

    Q: Did you ever teach him [Deputy Emery] in any
investigative                   procedures?
    A: No.


## BASSETT TRAINING

Deputy Bassett testified that he had formal training at the

police academy at Trinidad State Junior College.  (Aplt. App. at

157A)

Deputy Bassett testified in his deposition (Aplt. App. at

157A-158):

    Q:  Have you had any classes or anything here on the job?
    A:  Actual formal classes?
    Q:  Yes.
    A:  No.

Q:  So who provided you with your investigative training on the job?
A:  My various Sergeants that I've had.
Q:  Who were they?
A:  Kurt Emery.

From these episodes of altering and falsifying evidence, Deputies Emery and Bassett showed who and what they were—dishonest, incompetent investigators who knowingly violate the law.   Their own actions destroyed their qualified immunity and now establish that there are sufficient questions of material fact that this court must reverse and remand.

## III.

**There are sufficient facts that Deputies Emery and Bassett violated the U. S. Constitution search and seizure laws by their criminal trespassing on Mr. Robertson's land without a search warrant that this case must be tried by a fact-finder jury.**

Deputy Emery lost all chance to be found to be a reasonable, well-trained or prudent officer of the law when he lost his neutral, rational, perspective in this case.  After hours of surveillance and disappointed that in all of the hours and hours of surveillance Mr. Robertson never ventured off his own real property, Deputy Emery proceeded to violate more laws.  Deputy Emery and Bassett

trespassed onto Mr. Robertson's property without a warrant in the dark and dead of night to get a closer look.   To stay off Mr. Robertson's property meant being on the Cummings property, a good 400 feet from Mr. Robertson's house, from which it was physically impossible to see anything.  Deputy Emery unwittingly admitted they trespassed upon Mr. Robertson's land in the dead of the night.

Deputy Emery, at deposition, testified:

> I believe it was Cummings.  Wait a minute.  Mr. Cummings, I believe his fence comes acrost (sic) down here  (indicating).      I don't know.  There was a fence that we crossed and walked back here (indicating).

Aplt. App. at 178.

There is only one fence between the Robertson and Cummings property. When Deputies Emery and Bassett crossed it, going in either direction, they committed criminal trespass.  See aerial photos, Aplt. App. at 314.

In addition, by their going onto the Robertson property without a warrant, they further injured their credibility.   Deputy Emery and Bassett were guilty of a search of Mr. Robertson's property without warrant and were guilty of criminal trespass.[5]   The trespass violations could be prosecuted as a class 5 felony against both Deputies.

---

[5] **§ 18-4-504. Third degree criminal trespass**
(1) A person commits the crime of third degree **criminal trespass** if such person unlawfully enters or remains in or upon premises of another.
(2) Third degree **criminal trespass** is a class 1 petty offense, but:
(a) It is a class 3 misdemeanor if the premises have been classified by the county assessor for the county in which the land is situated as agricultural land pursuant to section 39-1-

Mr. Robertson has asserted a violation of the Fourth Amendment by the clearly unlawful and dishonest conduct of Deputies Emery and Bassett, which resulted in three arrests and two unlawful searches.   Mr. Robertson has articulated the violation of his clearly established constitutional right by Defendants Emery and Bassett's conduct with specificity.

## IV.

## Appellees have not carried their burden of showing no material issues of fact remain.

The Defendants, Deputies Emery and Bassett, have not met their burden to show to this court that there are no material issues of fact remaining that would defeat the claim of qualified immunity.[6]

---

102(1.6), C.R.S.; and
(b) It is a class 5 felony if the person trespasses on premises so classified as agricultural land with the intent to commit a felony thereon.

[6] *Walter v. Morton,* 33 F. 3d 1240 at 1242 (10th Cir. Okl 1994);  *see also* Fed.R.Civ.P. 56(c).

Deputies Emery and Bassett have been shown to be dishonest, perjurers, and trespassers.  A reasonable fact-finder jury could readily so find just on the basis of the falsified information of September 25, 2003 and of the criminal trespass. But the perjury and tampering go further.

Mr. Robertson asserts that based upon a pattern of past criminal tampering of evidence, Deputy Emery could have and did tell Samantha what she should say on November 4, 2003.   There has been no substantiation that Samantha actually informed Deputy Emery that Mr. Robertson peered into her bedroom window.   In fact Samantha's testimony was in opposition.

On November 13, 2003, (Aplt. App. at 233). Samantha testified that she and her brother were playing in the car in front of the house, not in her bedroom in the rear of the house.  Samantha testified that her brother was turning the lights in the car on and off, not the lights in her bedroom, as Deputy Emery swore to in his affidavit.

There is a genuine issue of material fact as to whether Samantha ever told Deputy Emery any of those words he wrote in his Affidavit.  Deputy Emery is trained enough to know what it

takes to prove a violation of restraining order, and he and Deputy

Bassett had a good start on falsifying evidence to cause an

arrest.    A reasonable jury could readily find that their pattern of

prior acts of falsification would tend to prove that Deputy Emery

illegally coached Samantha on November 4, 2003, as to what to

say when she went to court, and by the time she testified, she

forgot which story he said to tell.

No reasonable officer would falsify evidence or trespass onto a person's

property to do surveillance.  No reasonable officer would find "suspicious" a man

standing on his porch adjusting his waistline, a football field away from the alleged

victim, Murnane's house.   No reasonable officer would find that this same man

"had something on his mind" (something suspicious) that Deputy Emery's

presence at 400 feet away kept this man from doing.   Aplt. App. at   179, 180.

Deputies Bassett and Emery are, at their best, incompetent, and at the worst,

out and out criminals.  They crossed the line into criminal conduct when they

altered the September 25, 2003 exculpatory evidence, and they descended further

into misconduct from there.

**V.**

## Genuine issues of material fact exist that a reasonable jury could return a verdict for Mr. Robertson.

All evidence must be viewed in a light most favorable to the nonmoving party.   There is a "genuine" issue of material fact if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   A reasonable jury could find for Mr. Robertson in this matter.

Deputies Emery and Bassett kept using the false testimony which had Mr. Robertson peering into bedroom windows despite the fact that by November 13, 2003, it was clear that no one had seen Mr. Robertson peering into a bedroom window.

Even after Samantha testified differently in court on November 13, 2003, Deputy Emery kept using these same false, unsubstantiated words in the Affidavit for Warrant of December 2, 2003, the search warrant and for the February 12, 2004 arrest.

Samantha had no motivation to testify differently than Kurt Emery's words. Surely her motivation would have been to match Deputy Emery's words of November 4, 2003 in her testimony on November 13.  The fact that her sworn words in court were in contravention to those words clearly creates a genuine issue of material fact.  Samantha is the person upon whom Deputy Emery's complete affidavit rests.   If she doesn't back up Deputy Emery's words when called upon to

do so in a court of law, then a genuine issue of material fact arises as to whether Deputy Emery intentionally lied in his affidavit. The genuine issue of material fact must be decided by a fact finder, not a court.

This is a genuine issue of material fact

## CONCLUSION ON FALSE ARREST AND IMPRISONMENT ISSUES

When officers are dishonest, incompetent, intentionally alter exculpatory evidence into evidence of guilt, prevaricate, trespass and violate the law themselves in order to obtain warrants and fabricate evidence, no probable cause can exist. As well, the Deputies lose qualified immunity.

Genuine material issues of the Deputies' dishonesty, credibility, and incompetence exist. These issues must be determined by the fact finder—a jury. A reasonable jury could readily find that Deputy Bassett and his supervisor, Deputy Emory, were incompetent, falsified evidence and improperly caught up emotionally in the case that their affidavits for arrests, with or without warrants, were tainted so that the Deputies lost qualified immunity and had no probable cause to arrest. This Court must reverse and remand for trial.

## Summary of the Argument--American Disabilities Claim

I.    **The District Court erred in granting summary judgment for the Appellees because there were genuine issues of material fact in dispute as to whether Mr. Robertson was an individual with a disability under the Americans with Disabilities Act.**

II.   **The District Court erred in granting summary judgment for the Appellees when there were genuine issues of material fact in dispute as to whether Appellees discriminated against Mr. Robertson and failed to reasonably accommodate his hearing disability.**

## A.  STANDARD OF REVIEW

This Court exercises plenary review over the grant of summary judgment, applying the same standard that the lower court should have applied. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A____. The appellate court views the evidence in the light most favorable to the non-moving party to determine whether there are any

genuine issues of material fact and whether the district court has correctly applied the relevant substantive law.

## B.  ARGUMENT

I.  **The District Court erred in granting summary judgment for the Appellees because there were genuine issues of material fact in dispute as to whether Mr. Robertson was an individual with a disability under the Americans with Disabilities Act.**

    A.       **Factual issues exist as to whether Mr. Robertson is substantially limited in the major life activity of hearing.**

The United States Supreme Court has spoken often on the issue whether a plaintiff is an individual with a disability under the ADA.  See *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999); *Albertson's v. Kirkingburg*, 527 U.S. 555 (1999); *Murphy v. United Parcel Service, Inc.,* 527 U.S. 516 (1999); *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002); and *Bragdon v. Abbott,* 163 F. 3d 87 (1998).   The ADA defines disability as:

> (A)    a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.
>
> See 42 U.S.C. 12102(2).

There is no real dispute that Mr. Robertson has a hearing disability. He states in his affidavit that "I am profoundly deaf;" that he "commenced becoming deaf in 1964 while I was in the Air Force," and that the Air Force determined that he was losing his hearing in 1965. Mr. Robertson, who is 62 years old, had a cochlear implant in 1990, at age 46, which was paid for by the Veterans Administration. Even if the cochlear implant could be considered a mitigating measure, see Sutton, Mr. Robertson states that "I cannot hear over the telephone or any mechanical device, such as an intercom, and I cannot hear a television or radio." He further states that he can only watch television programs that have "closed captioning." Aplt. App. at 303. Finally, Mr. Robertson can not use any electronic device which requires the ability to hear, and he can not hear people who are turned away from him, and he could not hear anything beyond a few feet.

In considering whether Mr. Robertson is substantially limited in the major life activity of hearing, the following factors should be considered—the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected long term impact of or resulting from the impairment. Fed. Reg., Vol. 56, No. 144, Friday, July 26, 1991, p. 35694, at 35699. DOJ regulations define "major life activities" to include functions such as "hearing" and "speaking." 28 C.F.R. §35.104 (1)(B)(ii).

Here, the nature and severity of Mr. Robertson's impairment is clear and well documented. By virtue of an inherited gene, he became deaf as an adult. Aplt.

App. at 303.  Mr. Robertson received a 100% disability benefit from the Veterans

Administration.  Aplt. App. at 336.  He also received Social Security Disability

benefits.  Aplt. App. at 336.    Mr. Robertson has had cochlear implant surgery, but

his hearing disability is permanent and long-term.  He has had hearing disability

for some 40 years.  There is no expectation that his hearing disability will improve,

and, with age, if anything, his hearing disability may get worse.


Moreover, the United States Supreme Court in *Toyota* made clear that

"major life activities" mean "important" and that this statutory term "refers to

those activities that are of central importance to daily life." See *Toyota*, 534 U.S. at

197.  Mr. Robertson can not use the telephone, and he can not watch television

without closed captions.  The activities of talking with people, using a telephone,

listening to the radio, and watching television are activities that are of central

importance to daily life.   While Mr. Robertson has had cochlear implant surgery,

again, even if this surgery could be considered a mitigating measure for purposes

of *Sutton,* Mr. Robertson still cannot hear people who are more than two or three

feet away, cannot use the telephone, listen to the radio, or watch television without

closed captions.

Yet, the District Court found that despite this evidence the "Plaintiff can not

prove that his hearing impairment substantially limits his major life activity of

hearing."  Aplt. App. at 33.  The District Court cites Mr. Robertson's one word

answer "No" to the question "It doesn't physically bother you, not hearing?" Aplt. App. at 34. This answer is susceptible to many interpretations, for example, that after 40 years of having a hearing disability, Mr. Robertson has acknowledged that he can not hear, that he can not listen to the radio, use the telephone, or watch TV without captions, but that his hearing disability is not a physical ailment; that Mr. Robertson does not have "problems" with his ears in the sense of ear aches, ear infections, etc. Mr. Robertson was not sick; he does not consider his hearing impairment to be a "physical ailment." The District Court categorizes his one word answer as "Plaintiff's own admission" that his "hearing impairment is not `substantial' within the meaning of the ADA" Aplt. App. at 34. Mr. Robertson has admitted to no such thing. The District Court should not have granted summary judgment to Appellees based on erroneous conclusion drawn from a health related question and one word answer.

Mr. Robertson's affidavit that he is profoundly deaf, his cochlear implant surgery, his receipt of Veterans benefits, and his receipt of Social Security benefits, coupled with his inability to hear any thing more than three feet away, use the telephone, listen to the radio, or watch television without closed captions, conclusively demonstrates that he has a disability, that he is substantially limited to the major life activity of hearing, as a matter of law. Yet, his only burden at the district court level was to present sufficient evidence that he has a disability under

the ADA.  He has done so, and this Court should reverse and remand on this issue.
[7]

### 1.    Factual issues exist as to whether the Appellees knew of Mr. Robertson's hearing disability.

Mr. Robertson has also presented sufficient evidence to demonstrate that the Appellees knew or were aware of his hearing disability at the time the discriminatory events occurred.

First, Mr. Robertson states in his affidavit that "Regarding my hearing impaired status, the detention officers on November 4, 2003, had to know that I was hearing impaired because they found "hearing batteries" in my pockets **and** inventoried them."  Aplt. App. at 229.  He believed that the detention officers at the time he was booked knew that he was deaf.

Second, Deputy Emery testified that he informed detention officers that Mr. Robertson was deaf during the November 4, 2003 arrest and overnight detention and during the February 12, 2004, arrest. [8]  Aplt. App. at 189.  Deputy Emery also admitted that he spoke to Mr. Robertson in a louder voice than normal tone and that he "may have seen" Mr. Robertson's cochlear implant.  Aplt. App. at 190.

---

[7] Alternatively, Mr. Robertson also argues that he has a record of an impairment.  See 42 U.S.C. 12102(2)(B).  Mr. Robertson has undergone cochlear implant surgery by the Veterans Administration in 1990. He signed HIPAA medical release for the Appellees to obtain all of his medical records as to his hearing disability.  Aplt. App. at 303.

[8] According to Mr. Robertson, whose allegations must be taken as true for summary judgment, Deputy Emery looked Mr. Robertson "right in the eye while talking to me," and that when Deputy Emery spoke with an accompanying Deputy, Mr. Robertson could not understand what they said. Aplt. App. at 303.

This evidence demonstrates that he believed that Mr. Robertson has a hearing disability.

Third, Deputy Bassett admitted, when asked whether he knew Mr. Robertson was deaf or hearing impaired, that "I had heard he was hearing impaired."  Aplt. App. at 157C.

Fourth, Detention Center shift commander Ranae Schulte admitted that she knew Mr. Robertson was deaf at his arrest on December 2, 2003.  She further admitted that she knew that the detention officers knew that Mr. Robertson was deaf, that she knew that Mr. Robertson could not use the telephone, and that the detention center had no TTY equipment.  Aplt. App. at 248.

This evidence was sufficient for summary judgment purposes to demonstrate that factual issues existed whether Appellees knew that Mr. Robertson had a hearing disability at the time the discrimination occurred.
The District Court erred in holding as a matter of law that Mr. Robertson failed to inform the detention officers of his disability.

**II.  The District Court erred in granting summary judgment for the Appellees, when there were genuine issues of material fact in dispute as to whet her Appellees discriminated against Mr. Robertson and failed to reasonably accommodate his hearing disability.**

## A. The ADA requires a detention center to provide auxiliary aids and services to ensure effective communication with individuals with hearing disabilities.

Correctional facilities, detention centers, and jails must ensure that their employees can communicate effectively with deaf individuals. Congress enacted the ADA in order to provide (i) "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and (ii) "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1)-(2). Section 202 of the ADA uses broad and inclusive language to define its reach:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
>
> 42 U.S.C. §12132.

The Appellees are public entities subject to the ADA. *See* 42 U.S.C. §12131(1)(B) (public entity defined as "any department, agency, special purpose district, or other instrumentality of a . . . local government."). There is no exclusion for detention centers. *See Pennsylvania Dept. of Corrections v.* Yeskey, 524 U.S. 206 at 209; and *Chisolm v. McManimon,* 275 F.3d 315 (3rd Cir. 2001). Title II of the ADA applies broadly "to anything a public entity does." *See* 28 C.F.R. Part 35, App. A, §35.102 at 441.

Mr. Robertson is "qualified" under the ADA.  *See* 42 U.S.C. §12131(2) ("qualified individual with a disability " defined as ". . . an individual with a disability who, with or without . . . the removal of . . . communication . . . barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities of the public entity.").  See also *Chisolm v. McManimon,* 275 F.3d 315 (3ʳᵈ Cir. 2001)

Title II prohibits the Appellees from excluding Mr. Robertson from participating in or denying him the benefits of their services, or otherwise discriminate against him because of his hearing disability.

The United States Department of  Justice (hereinafter "DOJ") has promulgated ADA regulations implementing Title II of the ADA which set forth the steps a public entity must take to ensure that it does not exclude persons with disabilities from receiving the same benefits afforded to the general population.  *See* 42 U.S.C. §12134(a).[9]   The subpart entitled "Communications" provides:

> (a)           A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

---

[9]The DOJ regulations are entitled to "substantial deference." See *Helen L. v. DiDario*, 46 F.3d 325, 331-332 (3d Cir. 1995); and *Chisolm v. McManimon,* 275 F.3d 315 (3ʳᵈ Cir. 2001)

(b)(1)      A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

(b)(2)      In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

*See* 28 C.F.R. §35.160. DOJ states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communications exists or that the use of the means chosen would not be required under 35.164." *See* 28 C.F.R. Part 35, App. A, §35.160 at 463.

The ADA defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." *See* 42 U.S.C. §12102. DOJ also defines "auxiliary aids and services" to include:

(1) Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

*See* 28 C.F.R. §35.104(1). Public entities, such as detention centers and courts, are required to provide auxiliary aids and services so that a person with a hearing

disability can communicate to the same extent as a hearing person in the same circumstances.  Under the ADA, interpreters, TDDs, and captioning are routinely provided to ensure effective communication for deaf detainees and prisoners by correctional facilities, detention centers, and jails.

The ADA clearly requires the provision of auxiliary aids and services to ensure effective communication in circumstances where a deaf detainee's rights are involved and where serious consequences may ensue.  Basic communication, in and of itself, is a service that Appellees engage in with each and every detainee. The Appellees had to, but failed, to communicate as effectively with Mr. Robertson and all other individuals with hearing disabilities as it does with nondisabled detainees.

**B.    Section 504 requires detention centers to provide auxiliary aids and services to ensure effective communication with deaf individuals.[10]**

Congress enacted the Rehabilitation Act in order to "ma[k]e a commitment to the handicapped that, to the maximum extent possible they shall be fully

---

[10]The purpose and effect of Title II of the ADA is to extend the antidiscrimination policy embodied in the Rehabilitation Act to "all services, programs, and activities provided or made available by [public entities], regardless of the receipt of Federal financial assistance. "  *See* 28 C.F.R. App. A §35.102 (1993).  Compare 42 U.S.C. §12132 with 29 U.S.C. §794.  The District Court recognized that the factors and standards governing questions of alleged violations of the ADA are the same as those governing claims brought under the Rehabilitation Act.  App 38.  *See Yeskey*, 118 F.3d at 170; *Chislom*; *Helen L*, 46 F.3d at 330 n. 7; *Calloway*, 89 F. Supp.2d at 551.

integrated into the mainstream of life in America."  S. Rep. No. 890. 95th Cong.,

2d Sess. 39 (1978).  This commitment is reflected in §504:

> No otherwise qualified individual with a disability. . . shall, solely by reason
> of her or his disability, be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under any program or activity
> receiving Federal financial assistance.

*See* 29 U.S.C. §794.[11]   The broad reach of §504 applies to "all the operations of . .

. a department, agency, . . .or other instrumentality of a state or of a local

government."  *See* 29 U.S.C. §794(b).

In regulations and analysis, DOJ states unequivocally that detention and

correctional facilities must provide auxiliary aids and services to ensure effective

communication with deaf individuals who are arrested and detained.  DOJ's §504

regulations provide:

> A recipient that employs fifteen or more persons shall provide appropriate
> auxiliary aids to qualified handicapped persons with impaired sensory,
> manual or speaking skills where a refusal to make such provision would
> discriminatorily impair or exclude participation of such persons in a program
> receiving Federal financial assistance.  Such auxiliary aids may include . . .
> qualified interpreters, readers, and telephonic devices. . .

---

[11]   The purpose and effect of Title II of the ADA is to extend the antidiscrimination
policy embodied in the Rehabilitation Act to "all services, programs, and activities
provided or made available by [public entities], regardless of the receipt of Federal
financial assistance. "  *See* 28 C.F.R. App. A §35.102 (1993).  Compare 42 U.S.C.
§12132 with 29 U.S.C. §794.  The District Court recognized that the factors and
standards governing questions of alleged violations of the ADA are the same as those
governing claims brought under the Rehabilitation Act.  App 38.  *See Yeskey*, 118 F.3d at
170; *Chislom; Helen L*, 46 F.3d at 330 n. 7; *Calloway*, 89 F. Supp.2d at 551.

28 C.F.R. §42.503(f).

In the analysis to the regulations, DOJ "set forth a number of situations in which recipients are required under this subpart to provide auxiliary aids [42.503(f)] to remove communication barriers that prevent accessibility to federally assisted programs." 45 Fed. Reg. 37629-30 (June 3, 1980).

2. Detention and Correctional Agencies and Facilities. These agencies include jails, prisons, reformatories and training schools, work camps, reception and diagnostic centers, pre-release and work release facilities, and community-based facilities...

Facilities available to all inmates or detainees, such as classrooms, infirmary, laundry, dining areas, recreation areas, work areas, and chapels, must be readily accessible to any handicapped person who is confined to that facility. Beyond insuring the physical accessibility of facilities, detention and correctional facilities must insure that their programs and activities are accessible to handicapped persons. . .

Correctional agencies should take into account any handicaps which inmates may have in classifying them . . .

45 Fed. Reg. at 37630 (emphasis added).

Section 504 and DOJ's §504 regulations clearly require detention centers to provide auxiliary aids and services when a deaf individual is detained.

**C.**  **Factual issues exist as to whether the Appellees failed to provide auxiliary aids and services to ensure effective communication with and for Mr. Robertson.**

The District Court erred when it concluded as a matter of law that the Appellees did not discriminate against Mr. Robertson despite the fact that they did not provide him with auxiliary aids and services necessary to ensure effective communication.  The District Court impermissibly transformed itself into a trier of fact; resolved disputed factual issues against the nonmoving party, Mr. Robertson; and overreached in an effort to dispose of the case before trial.  The undisputed facts in this case show that the Appellees did not provide any reasonable accommodation or any auxiliary aid or service for Mr. Robertson. Thus, as Mr. Robertson states: "I did have difficulty during the arrest, but I had to make the best of it."  Aplt. App. at 303 and 304.

**2. A factual issue exists as to whether the Appellees discriminated against Mr. Robertson because he could not make a telephone call.**

The undisputed evidence in this case demonstrates that hearing detainees have a telephone in their pod and that they can freely use at their convenience, and without permission or assistance from any detention officer between the hours of 6:30 a.m. and 11:00 p.m. daily. Aplt. App. at 206.  The undisputed evidence also shows that inmates with hearing disabilities had no telephone access available to them at the time the discriminatory events occurred in this case, i.e. when Mr. Robertson was arrested and detained.

When asked whether there was any way in which Mr. Robertson could make a private telephone call to someone outside the detention center, i.e. to his family or his lawyer, Caption Kimbal Nichols replied: ""We did not have a TTY at that time, no." Aplt. App. at 205. See also the deposition testimony of Sheriff Casias: "There was no TTY." Aplt. App. at 197B.  Shift Commander Ranae Schulte also stated:

> I myself was a detention officer present on December 2,  2003 at the Las Animas Detention Center when Mr.     Robertson was arrested. The detention staff knew he was     deaf.  I knew that the detention center had no TTY     equipment. . . Mr. Robertson told me he could not hear   over the telephone.
>
> Aplt. App. at 248.

The ADA and §504 both place a limit on the lengths to which a public entity must go to provide auxiliary aids.  A public entity is not required to take any action if "it can demonstrate [the action] would result in a fundamental alteration in the nature of a device, program or activity. . . "  *See* 28 C.F.R. §35.164.  However, the public entity has the burden to prove that providing the auxiliary aid would create such a hardship.

> In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens.  The decision that compliance would result in

such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion.  If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity.

*See* 28 C.F.R. §35.164.

Although the ADA requires that the detention center give "primary consideration" to any request by Mr. Robertson for auxiliary aids and services, see 28 C.F.R. 35.160, the District Court concluded that Mr. Robertson did not  offer any support for his contention that he was denied the use of a telephone and TTY equipment.  Aplt. App. at 35.  This, yet, raises a number of factual issues that should not have been decided on a summary judgment motion.

First, Mr. Robertson presented evidence there was supposed to be an inmate handbook in each cell that explained to inmates what they could ask for, but that there was no handbook in his cell. Aplt. App. at 212.  He also presented evidence that he did not know he could ask for paper and pencil, and, for that reason, he did not ask for paper and pencil. Further, Mr. Robertson presented evidence that there was no paper and pencil in his cell provided by the detention center and that detention officers, who knew of his hearing disability, did not offer him paper and pencil.  Aplt. App. at 212, 304.   Finally, as Mr. Robertson explains:

Further, once I was in my cell that night, no detention officer ever came by to speak to me while I was awake.  Thus, I couldn't ask for a pen and pad.  The next morning after I saw the sign on the wall stating that I could leave a note in a box for the detention officers, I got a piece of paper and pencil from another inmate. That inmate had access to a telephone in the pod that he, as a full hearing person, could use. I wanted to speak to my lawyer, but couldn't telephone her because there was no TTY or TDD equipment in the jail anywhere.  Further, no detention officer ever responded to my request for an attorney.  . .

*The note I left for the detention officers that I wanted to telephone my attorney went ignored.* I never talked to my attorney over the telephone during that entire incarceration and I was denied effective communication and equal protection of the laws. . . .

I never went up to the window to yell, because I wouldn't have been able to hear if anyone yelled back. Further, I couldn't hear if any detention officer tried to speak to me through the speaker in the room.

Aplt. App. at 304 and 305    [Emphasis added]

Mr. Robertson, having presented specific evidence that he left a note for detention officers that he wanted to telephone his attorney, it was not up to the District Court to sit as a trier of fact and make what in effect was a factual finding that Mr. Robertson did not have made a request any auxiliary aids and services. The District Court erred by apparently considering the evidence in the light most favorable to the moving party for summary judgment, i.e. the Appellees, rather than in the light most favorable to Mr. Robertson in disregarding his evidence.

There are factual issues whether Appellees discriminated against Mr. Robertson when they admittedly did not have a TTY to enable him to communicate with family and his attorney, that hearing inmates were able to make telephone calls, a jury should have determined whether Mr. Robertson's actions were reasonable under the circumstances and whether the Appellees discriminated against him.  Appellees offer no explanation as to why they did not have a TTY in place at the detention center, raising further factual issues as to whether their actions were reasonable or discriminatory.   See *Chisolm v. McManimon,* 275 F.3d 315 (3ʳᵈ Cir. 2001). [12]

For purposes of Mr. Robertson's appeal, the evidence taken in the light most favorable to him is that Appellees made no effort to provide him with TTY services to ensure effective communication.  There was no testimony as to any efforts by Appellees to secure a TTY, and the grant of summary judgment on a hotly disputed issue—whether, how, and to what extent Mr. Robertson requested auxiliary aids and services--is too thin a reed to support a motion for summary judgment.

The District Court transformed factual issues for a jury into undisputed facts in favor of the non-moving party as a basis for granting summary judgment to the

---

[12] Rather than concentrate on the Appellees' failure to have a TTY at the detention center, a seemingly per se violation of Title II and 504,  the Appellees would have a jury believe that it was Mr. Robertson's fault for somehow not asking for a TTY, when he insisted that he did so.

Appellees.  It is not enough for the District Court to merely speculate on whether or how Mr. Robertson made any request for auxiliary aids and services.  The import of the District Court's decision is that Appellees did all they had to do, whether or not in fact it was reasonable or effective.  Mr. Robertson should have the same access as other detainees to make telephone calls, and the Appellees' failure to ensure that same access violates Title II of the ADA. See *Chisolm v. McManimon,* 275 F.3d 315 (3rd Cir. 2001).

A trier of fact could easily conclude that Appellees discriminated against Mr. Robertson in violation of the ADA when they did not have a TTY available for his use during his detention.

**2.    A factual issue exists as to whether the Appellees discriminated against Mr. Robertson because the televised advisory hearing was not accessible to him.**

Factual issues exist as to whether the Appellees discriminated against Mr. Robertson because the televised advisory hearing was not accessible to him. Because Mr. Robertson was arrested on violation of a civil restraining order, bond was not available to him until he was seen by a judge.  On the morning of November 5, 2003, after Mr. Robertson was effectively denied a telephone call to his family and attorney, a televised advisory court hearing was held with a judge being at the courthouse and Mr. Robertson at the detention center advisement room.  Mr. Robertson was placed in shackles, handcuffed to a bench facing a

television, with his back to the detention officer at the rear of the room.  There

were no captions on the television, and no detention officer ever attempted to

inform him of the nature of the hearing, what the judge was saying, or the results

of the hearing.  As Mr. Robertson testifies:

> Regarding the video advisory hearing, I was not advised before hand by any
> detention officer where I was being taken. I was placed in shackles. I was
> not advised as to what the video hearing was for.  I was not advised as to
> what anyone said at the advisement hearing.  I could not hear any of the
> words being spoken at the video advisement hearing.  There was no closed
> captioning for the hearing impaired on the video system.  I was forced to
> attend a court hearing without being able to hear anything.  I explained to the
> detention officer that I couldn't hear.  She did nothing about it.  No one at
> the jail explained to me what the hearing was about.  When I was released
> and met with my attorney, face to face, I learned what it was all about.  . . .
> the hearing was not video or audio taped, nor a court reporter provided,. . .
> Aplt. App. at 305 and 306.

The District Court did not address this issue.  Taken in the light most

favorable to Mr. Robertson, Appellees knew that Mr. Robertson was to appear

before a judge at a televised advisement hearing, knew that he has a hearing

disability, knew that he could not understand what was being said in the televised

hearing, knew that he did not know the purpose of the hearing, and made no

attempt to advise the court that Mr. Robertson could not participate in or benefit

from the legal proceedings, made no attempt to explain to Mr. Robertson what was

to take place, what was taking place, and would be taking place as a result of the court proceeding. In short, the Appellees did basically nothing to ensure that Mr. Robertson receive any communication, let alone, effective communication.

These circumstances are even more egregious than *Chisolm*, where Mr. Chisolm was brought into court, no interpreter was provided, and the case was postponed until an interpreter could be secured. See *Chisolm v. McManimon,* 275 F.3d 315 (3rd Cir. 2001).[13] There was no effort on the part of Appellees to advise the judge that Mr. Robertson could not understand anything at the court hearing and no effort was made to bring Mr. Robertson into court where he might be able to benefit and participate in the legal proceedings with auxiliary aids and services (i.e., real time captioning, such as that produced by a court stenographer). In short, although Appellees knew that Mr. Robertson has a hearing disability, they did nothing to ensure effective communication with him.

While Appellees were not "required to guess what accommodations they should provide," conversely, they should not wait for Mr. Robertson to ask for auxiliary aids and services when they knew that he could not understand the nature of the legal proceedings and bringing him to court, for example, might have accommodated his needs. Appellees knew or should have known that Mr.

---

[13]In *Chisolm*, detention officials took some action to assist Mr. Chisolm—providing him with a prison counselor, letting him use his own TTY", and postponing a court hearing because there was no effective communication. The Third Circuit found that even with these efforts made by detention officials to accommodate Chisolm's hearing disability, factual issues were raised as to whether detention officials discriminated against him.

Robertson was not able to hear the televised advisory hearing and would need some accommodation.  Appellees knew that Mr. Robertson was to attend the televised advisory hearing; Mr. Robertson did not know.  Appellees did not provide Mr. Robertson with the opportunity to request an accommodation until after he was situated at the televised advisory hearing.  As soon as Mr. Robertson realized that the televised advisory hearing was taking place, a circumstance that first presented Mr. Robertson with an opportunity to request an accommodation, he explained to the detention officer that he could not hear it, but the officer was unresponsive.  Aplt. App. at 305, 306.    In Mr. Robertson's own words, "I explained to the detention officer that I couldn't hear.  She did nothing about it.  No one at the jail explained to me what the hearing was about."  Aplt. App. at 305, 306.  Similarly, advising the judge that Mr. Robertson did not and could not participate and benefit from the court hearing could have allowed the court the opportunity to accommodate his disability.  Finally, simply advising Mr. Robertson in writing as to the purpose and result of the televised advisement hearing would have been one step, albeit imperfect, under the circumstances.  Here, the Appellees did nothing to relay critical information about what was being said in his own court case to him.

Here, the utter lack of any efforts by the Appellees to accommodate Mr. Robertson's disability raises factual issues as to whether they violated Title II of the ADA.

The case law is clear that the reasonableness of an accommodation is a question of fact for resolution by the trier of fact and not by a court on a motion for summary judgment. See *Chisolm,* 275 F.3d 315 (3rd Cir. 2001); see also *Bonner v. Lewis*, 857 F.2d 559 (9th Cir.1988);[14] *Duffy v. Riveland*, 98 F.3d 447 (9th Cir.1996), and *Randolph v. Rodgers*, 170 F.3d 850 (8th Cir. 1999); *Clarkson v. Coughlin*, 898 F. Supp. 1019 (S.D.N.Y, 1995),[15] *Calloway v. Boro of Glassboro Department of Police*, 89 F. Supp. 543 (D. N.J. 2000);[16] and *Brown v. King County Dep't. of Adult Corrections*, 1998 WL 1120381 (W.D.Wash. Dec. 9, 1998)[17]. See

---

[14] On remand, in *Bonner v. Lewis*, 714 F. Supp. 420, 425-426 (D. Ariz. 1989), a federal court held that "to require a deaf. . . inmate to navigate through this legal miasma [prison disciplinary proceedings and other hearings] without a qualified interpreter certainly would not comport with the department's stated goal of accomplishing discipline with dignity, reason, and humaneness.

[15] In *Clarkson*, a New York federal court granted summary judgment for deaf inmates in a class action suit, holding that by "failing to provide interpretative services during reception and classification, through the absence or inadequacy of assistive communications devices for telephone and television. . . defendants have violated both §504 of the Rehabilitation Act and the ADA." *Clarkson*, Id. at 1032. The court also held that the defendants in *Clarkson* discriminated against the deaf inmates by their failure to make reasonable accommodations to facilitate full participation by class members in educational, vocational and rehabilitative contexts such as classes and counseling sessions, by their failure to provide qualified interpreters or other needed assistive devices for medical and mental health treatment (holding that communication between patient and medical personnel was essential to the efficacy of treatment), and by their failure to provide qualified interpreters or other needed assistive devices for disciplinary, grievances, and parole hearings.

[16] In *Calloway*, a New Jersey federal court recognized that "the assistance of an auxiliary aid or service, which includes a qualified interpreter, would allow a hearing impaired individual to participate in the specific police activity in an appropriate manner consistent with her disability. Moreover, this auxiliary aid or service would bestow upon the qualified individual with a disability the benefit of the specific activity.

[17] In *Brown*, the court held:
        Material issues of fact remain as to whether the alleged denials of
        plaintiff's rights were reasonably related to legitimate concerns for prison

also *Hanson v. Sangamon County Sheriff's Dep't*, 991 F. Supp. 1059 (C.D. Ill.

1998) (deaf arrestee, denied opportunity to post bond and to make a telephone call,

stated cause of action under ADA and §504.

Mr. Robertson's case is similar to these other cases. Appellees did not

provide any auxiliary aids or services to ensure effective communication with Mr.

Robertson. Instead, the facts taken in the light most favorable to Mr. Robertson

reveal that the Appellees did not address his note to contact his attorney, had no

TTY to enable him, and kept him in shackles and paraded him before a television

screen knowing that he could not understand the nature of the criminal proceedings

or participate or benefit from them. His case does not deal with "unqualified"

interpreters or even inmate interpreters. Mr. Robertson's case deals with a

complete lack of auxiliary aids and services. This case should be reversed and

remanded so that the factual disputes can be resolved by the trier of fact on a full

---

administration. For example, the lengthy denial of use of a TTY phone, when one
was readily available, does not seem to be entirely justified by the need for
security or other important prison concerns, especially when this item was
eventually provided without apparent disruption in prison routine. Nor would
providing interpreters during medical exams or installing a closed captioned
television appear to impinge unduly on the needs of prison administration.
Defendants' arguments as to the legitimate concerns of prison administration are
an insufficient basis on which to grant defendants' Motion for Summary
Judgment as to plaintiff's ADA claim.

*Brown,* 1998 WL 1120381 at *7. In Brown, the court concluded that there was a delay in
allowing Brown access to any kind of telephone communication, "a form of
communication with the outside world that non-deaf inmates enjoyed freely." 1998 WL
at *9. Thus, the court concluded that Brown was denied readily available
accommodations for telephone communications and television viewing, accommodations
he required because of disability. Because Brown established that there were genuine
issues of material fact sufficient to overcome the county's motion for summary judgment,
the county's motion was denied.

record.  For purposes of a summary judgment motion, Mr. Robertson's civil rights claims are equally as deserving as the claims in *Bonner, Duffy, Randolph, Clarkson, Calloway,* and *Brown*.  At the heart of all these cases is a dispute about effective communication between a deaf person and corrections and detention employees, and police officers.

A detention center is not a free environment, but it should not be worse for detainees with hearing disabilities than it is for other detainees without hearing disabilities.  That is the point of the ADA and §504.  If the Appellees' view were correct, they could discriminate against individuals with hearing disabilities with impunity -- they could decide whether and when to provide auxiliary aids and services, and ignore any auxiliary aid request or plea to access communication.  Yet, the Appellees did just that, and the District Court ratifies the Appellees' discriminatory acts by drawing unwarranted conclusions from contested facts.  The grant of summary judgment for the Appellees should be reversed and remanded.

## **CONCLUSION**

Since there are genuine issues of material fact on all issues in this case that must be determined by a fact finder jury, this Court must reverse and remand on all issues.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel does request oral argument.   Appellant requests oral argument because the issues raised are important significant issues under Title II of the ADA, including the definition of "individual with a disability," and the requirement that public entities make reasonable accommodations and provide auxiliary aids and services.  The issues raised in the false arrest are also important national issues.

Dated this 15th day of June, 2006.        Respectfully submitted,

s/ Virginia H. Louden

Virginia H. Louden #4772
Attorney for Plaintiff
267 North Commercial Street
Trinidad, CO 81082
(719) 845-4060

MARC CHARMATZ
Senior Attorney
National Association of the Deaf
Counsel for Plaintiff on
ADA Issues
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7732